Francisco A. CABA, Appellant

v.

Eric J. WEAKNECHT.

Commonwealth Court of Pennsylvania.

Argued Sept. 10, 2012.

Decided Feb. 4, 2013.

Reconsideration Denied March 27, 2013.

Joshua G. Prince, Bechtelsville, for appellant.

Matthew J. Connell, West Chester, for appellee.

BEFORE: McGINLEY, Judge, and LEAVITT, Judge, and BROBSON, Judge.

OPINION BY Judge BROBSON.

On February 2, 2012, following an evidentiary hearing, the Court of Common Pleas of Berks County (trial court) overruled and denied the appeal of Appellant Francisco A. Caba (Caba). In his appeal to the trial court, Caba challenged the decision of Appellee Eric. J. Weaknecht, Sheriff of Berks County (Sheriff), to revoke Caba's concealed carry license pursuant to the Pennsylvania Uniform Firearms Act of 1995, 18 Pa.C.S. §§ 6101–6127(Act). Caba now seeks review of the trial court decision. For the reasons set forth below, we affirm.

## BACKGROUND

The Act is part of the Pennsylvania Crimes Code. Section 6106(a) of the Act makes the act of carrying a firearm in any vehicle or concealed (except in the home or at a fixed place of business) without a license a crime.[1] Each county of the Commonwealth has its own licensing authority.

---

1. Depending on the circumstance, the crime can be a third-degree felony or first-degree misdemeanor.

Except in a city of the first class, where the licensing authority lies with the chief of police or head of the police department, the county sheriff is the licensing authority under the Act. *See* 18 Pa.C.S. §§ 6102, 6109.

The Sheriff issued a license to Caba on August 20, 2009. By letter dated August 30, 2011 (Revocation Letter),[2] the Sheriff informed Caba that he was revoking Caba's license for the following reason: "A person whose character/reputation indicates danger to public safety." In the event of a revocation, the Act provides an appeal to the court of common pleas. *Id.* § 6109. On September 23, 2011, Caba filed an appeal with the trial court, contesting the Sheriff's revocation decision.

Caba served the Sheriff with discovery requests in the form of interrogatories and a request for production of documents. Caba filed a petition with the trial court to compel discovery responses with respect to his interrogatories numbered 4 and 5 and his document requests numbered 5, 6, and 7. The trial court heard the discovery petition on January 4, 2012. With the exception of ordering the Sheriff to produce a copy of Caba's license, the trial court denied Caba's discovery petition.

On February 2, 2012, the trial court conducted an evidentiary hearing on the merits of Caba's appeal.[3] At the outset of the hearing, the trial court ruled that the Sheriff bore the burden of proof in the matter. The Sheriff first called Jeremy Smith, the clerk in charge of firearms licensing in the Berks County Sheriff's Office (Office). Mr. Smith testified that he received a telephone call from Andrew Potts in January 2011, during which Mr. Potts expressed concern about Caba's license status in light of a particular incident that occurred in Hamburg, Pennsylvania. Mr. Smith advised Mr. Potts to express his concerns to the police officer investigating that incident.

The next time Mr. Smith heard of Caba was when he received a telephone call from Assistant District Attorney (ADA) Colleen Dugan. As a result of that conversation, Mr. Smith asked ADA Dugan to send him a copy of the criminal complaint that had been filed against Caba. At this point during the hearing, the Sheriff marked as Exhibit 1 the documents that Mr. Smith claimed he received from ADA Dugan, which all parties agreed on the record appeared to relate to a *private* criminal complaint filed by Mr. Potts against Caba for an incident on November 24, 2010, in Hamburg, Pennsylvania. Mr. Smith testified that he received this package of documents from ADA Dugan.

After he reviewed the records, Mr. Smith contacted Mr. Potts and asked him whether he would be willing to testify if the Sheriff chose to pursue a civil action against Caba. In addition to noting that Mr. Potts agreed to testify, Mr. Smith also testified that Mr. Potts informed him about another incident in Reading, Pennsylvania, dealing with Caba. Mr. Smith testified that he contacted the Reading Police Department to obtain the police record of that incident. The Sheriff marked that record as Exhibit 2.

Mr. Smith testified that he presented the above-described information to the Sheriff, and the Sheriff decided to revoke

---

2. The Revocation Letter refers to Caba's license interchangeably as a "license" and "permit." We note that a license under the Act is sometimes referred to colloquially as a permit. *See also* 18 Pa.C.S. § 6109(i) (using "permit" interchangeably with "license").

3. The following summary of the evidence adduced during the hearing is derived from the transcript of the February 2, 2012 hearing. (Reproduced Record (R.R.) 33a–73a.)

Caba's license under the Act. Mr. Smith also testified that he contacted a Magisterial District Judge's (MDJ) office about the Hamburg incident. The Sheriff marked as Exhibit 3 a record from the MDJ's office, showing Caba's conviction for a single count of harassment, a summary offense, for an incident on November 24, 2010.

On cross-examination, Mr. Smith testified that his direct testimony reflected the entirety of his investigation into the matter. The Sheriff testified next. He testified that, based on Mr. Smith's investigation, as recounted in Mr. Smith's testimony, he instructed Mr. Smith to revoke Caba's license.

The Sheriff then called Mr. Potts to testify, but Mr. Potts did not offer any material testimony on direct examination. Through Mr. Potts, the Sheriff marked for identification Exhibit 6, which Mr. Potts identified as a letter he wrote to the District Attorney when he filed a personal criminal complaint against Caba. Mr. Potts testified that the District Attorney refused to allow the private criminal complaint to proceed. The Sheriff then rested his case-in-chief.

Jose Rifas was Caba's first witness. Caba called Mr. Rifas to testify as to Caba's character and reputation in the community. He testified that he had known Caba's family for approximately eight years and served as a character reference for Caba when he applied for his license under the Act. He testified that he felt Caba was a good member of society and did not believe Caba was a threat or a violent person. He testified that, based on his discussions with other members of the community, Caba is regarded as a law-abiding citizen in his community. On questioning by the trial court, Mr. Rifas clarified that when he testified about his

discussions with other members of the community, he meant those who live in the Allentown area (Lehigh County), where Caba lived approximately four or five years before he moved to Berks County.

Caba then testified on his own behalf. He testified that he moved from Allentown to Fleetwood (Berks County) "about 5 years ago." [4] He testified that on the evening of November 24, 2010, he was not carrying his firearm because he was going to be in a bar and understood that firearms were not allowed in establishments that served alcohol. He further testified that on that evening, a Pennsylvania State Trooper questioned him about an incident between Caba and a male, Ryan Stufflet. The Trooper searched Caba and the general area around Caba that evening, but did not find a firearm.

On cross-examination, Caba testified that Mr. Potts and his wife were present when Caba and Mr. Stufflet had their altercation. He also testified that he believed Mr. Potts and his wife helped to break up the scuffle ("or whatever").

On rebuttal, the Sheriff recalled Mr. Potts. Mr. Potts testified that he witnessed an incident between Caba and Mr. Stufflet on the evening of November 24, 2010, in the parking lot of The Westy, Hamburg Hotel:

> I saw Mr. Caba locate a gun which he had dropped during the altercation that I broke up. I turned my back. I heard him charge the weapon, putting a round into the chamber which got my attention again. I turned to see him pursuing in the direction my wife and Mr. Stufflet had travelled with the gun raised above his waist and pointed in front of him.

---

4. The hearing on the merits was February 2, 2012. Based on Caba's testimony, he moved from Lehigh County to Berks County in or around 2007.

(R.R. 48a.) On cross-examination, Mr. Potts testified that his wife and Mr. Stufflet were cousins. He testified that it was nighttime (11:00 p.m.) and that when Caba retrieved the weapon, Mr. Potts was approximately three feet from him.

Caba's attorney then called Caba to the stand again. Caba disputed Mr. Potts' testimony. He testified that he dropped an item that evening, but that the item was his cellular phone, not a weapon. He described the cellular phone as black and silver. He stated further that it was very dark, as there were no lights in the parking lot. On cross-examination, Caba contended that Mr. Potts had mistaken Caba's cellular phone for a handgun. Caba further testified that he did not point either object, a cellular phone or a handgun, in a threatening manner.

This testimony prompted the Sheriff to re-call Mr. Potts. Mr. Potts disputed Caba's account of events. Mr. Potts testified that Caba did have a cellular phone, the lighted screen of which Caba used to locate his handgun. He testified that Caba definitely retrieved a midsized to compact semi-automatic handgun with "a black lower [and] silver or gray upper." Mr. Potts testified that he asked Caba what he planned to do with the gun and told him to put it away and go home. According to Mr. Potts, Caba said that he had a handgun permit. Mr. Potts testified that he left at that point, because he was unarmed and did not want to get shot. As he turned away, however, he heard Caba chamber (*i.e.*, load) a round in the weapon. He turned back in the direction of Caba and saw Caba raise the weapon waist-high and travel in the direction of Mr. Potts' wife and Mr. Stufflet.

Following the conclusion of the testimony recounted above, the trial court admitted Exhibits 3 (the MDJ record of conviction), 4 (instructions from the Office on how to apply for a license under the Act), and 5 (the Revocation Letter) into the record without objection. (R.R. 51a.) The trial court, on Caba's objection, refused to admit Exhibits 1 (relating to the private criminal complaint), 2 (police record of Reading, PA incident), and 6 (Mr. Potts' letter to District Attorney) into the record. (R.R. 52a–53a.) At the conclusion of the hearing, the trial court ruled from the bench, overruling and denying Caba's appeal. This appeal followed.[5]

## ISSUES ON APPEAL

On appeal, Caba raises several issues. The first set of issues relate to the conduct of the trial and whether the Sheriff met his burden of proof under the Act. Caba also raises three constitutional challenges. Caba argues that the provisions of the Act that require a license to carry a concealed weapon violate his right to bear arms under the Second Amendment to the United States Constitution and Article I, Section 21 of the Pennsylvania Constitution.[6] He

5. In appealing the Sheriff's determination to revoke his license to the trial court, Caba exercised his express statutory right to appeal under the Act: "An individual whose license is revoked may appeal to the court of common pleas for the judicial district in which the individual resides." 18 Pa.C.S. § 6109(i). The trial court reviewed this matter pursuant to Section 754 of the Local Agency Law, 2 Pa.C.S. § 754. *See* 18 Pa.C.S. § 6114 (incorporating Section 754 of Local Agency Law). Our review in this case, where the trial court took evidence and heard the matter *de novo*, will be limited to determining whether the trial court abused its discretion, whether it committed an error of law, or whether a violation of constitutional rights occurred. *See, e.g., Smith v. Nace,* 824 A.2d 416, 418 n. 1 (Pa.Cmwlth.2003); *Harris v. Sheriff of Del. Cnty.,* 675 A.2d 400, 401 n. 1 (Pa.Cmwlth. 1996).

6. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and

also alleges a deprivation of his right to procedural due process under the Fourteenth Amendment to the United States Constitution[7] and Article I, Sections 1, 9, and 11 of the Pennsylvania Constitution.[8] He further contends that Section 6109(e)(1)(i) of the Act violates the Equal Protection Clause of the Fourteenth Amendment.[9] Finally, Caba challenges the trial court's ruling on his discovery petition.

## DISCUSSION

### I

In this case, the Sheriff revoked Caba's license, finding him ineligible for licensure because his "character and reputation is such that [he] would be likely to act in a manner dangerous to public safety." 18 Pa.C.S. § 6109(e)(1)(i). Caba notes that the terms "character" and "reputation" are not defined in the Act, but that they mean two different things. Citing the Pennsylvania Supreme Court's decision in *Hopkins v. Tate*, 255 Pa. 56, 99 A. 210 (1916), Caba claims that the word "character" connotes "what a man is," while the word "reputation" connotes "what he is supposed to be." *Hopkins*, 255 Pa. at 61, 99 A. at 212. The Sheriff, Caba argues, was required to prove that Caba lacked both the character *and* reputation to justify his possession of a license under the Act. As for reputation, Caba argues that the Sheriff may not rely on specific acts, citing this Court's decision in *Harris v. Sheriff of Delaware County*, 675 A.2d 400 (Pa. Cmwlth.1996), and Rule 405 of the Pennsylvania Rules of Evidence. Caba contends that the Sheriff made no effort to investigate Caba's reputation and character in his community and offered no evidence of the same. Indeed, it was Caba who presented evidence, through the testimony of Mr. Rifas, of Caba's *good* reputation.

In response, the Sheriff argues that Rule 405 of the Pennsylvania Rules of Evidence allows evidence of specific acts to

---

bear Arms, shall not be infringed." Article I, Section 21 of the Pennsylvania Constitution provides: "The right of the citizens to bear arms in defen[s]e of themselves and the State shall not be questioned."

7. "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

8. With respect to procedural due process rights under the Pennsylvania Constitution, this Court has observed:

> The guarantee of due process emanates from the Fourteenth Amendment of the Federal Constitution and from a number of provisions of the Declaration of Rights, particularly Article I, Sections 1, 9 and 11 of the Pennsylvania Constitution.

*Snyder v. Dep't of Transp.*, 977 A.2d 55, 58 n. 5 (Pa.Cmwlth.2009) (en banc). Article I, Section 9 of the Pennsylvania Constitution applies by its terms to criminal defendants. Accordingly, it is not applicable in this non-criminal proceeding. Sections 1 and 11 of Article I of the Pennsylvania Constitution provide, in relevant part:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.
>
> ...
>
> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial, or delay.

"The due process requirements of the Pennsylvania Constitution are indistinguishable from the Fourteenth Amendment and, therefore, the same analysis applies to both provisions." *Turk v. Dep't of Transp.*, 983 A.2d 805, 818 (Pa.Cmwlth.2009).

9. "No State shall ... deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, § 1.

prove character and reputation in a license revocation proceeding under the Act. The Sheriff also maintains that Caba's reliance on our decision in *Harris* is misplaced. Finally, the Sheriff notes that the trial court rejected Mr. Rifas' testimony.

■ We will first address Caba's statutory construction argument—*i.e.,* that a licensing authority must prove both a lack of character and a lack of good reputation to justify revocation of a license. To support his argument, Caba relies on the General Assembly's use of the conjunction "and" between the words "character" and "reputation" in Section 6109(e)(1)(i) of the Act and the Pennsylvania Supreme Court's decision in *Hopkins.*

There does not appear to be any case law directly on point. We do not find *Hopkins* controlling or persuasive. *Hopkins* involved a civil action for defamation, wherein the plaintiff alleged that the defendant slandered him by sullying his *reputation* for honesty. Among the issues that the Pennsylvania Supreme Court decided in *Hopkins* was whether the trial court should have admitted evidence of the plaintiff's poor reputation for honesty in a community different from the one in which the plaintiff lived at the time of the alleged slanderous statement and eleven years before the alleged statement was made, in mitigation of damages. Our Supreme Court held that the trial court erred in admitting such evidence, reasoning:

> The present action was brought to recover for the injury to the plaintiff's reputation at the time the defamatory words were spoken. The question therefore is what his reputation for honesty was in that neighborhood at the time when it was assailed by the defendant. This is the time he alleges he sustained injury by reason of the utterance of the alleged slander by the defendant. If his reputation was bad at that

time, it may be shown, under proper pleadings, in mitigation of damages.

*Hopkins,* 255 Pa. at 60–61, 99 A. at 211–12. The Court then pointed out how one's reputation in a former community may be different than his reputation in his current community:

> A man may, with or without his fault, have a bad reputation for honesty in the neighborhood in which he then resides; but removing therefrom he may, after living in another and distant place for several years and leading an honest and upright life, acquire a good reputation in the latter community. *His character may not undergo a change, but his reputation in the two places is not the same. 'Character' and 'reputation' are not synonymous terms. The former is what a man is, the latter is what he is supposed to be, says Webster.*

*Id.* at 61, 99 A. at 212 (emphasis added). In context, then, the Pennsylvania Supreme Court drew a distinction between one's character and one's reputation in *Hopkins* for the sole purpose of emphasizing that character may be a constant, but reputation is always subject to change. We acknowledge this truism.

Nonetheless, though character and reputation are not synonymous terms, they are related. We see this in *Hopkins,* wherein the Pennsylvania Supreme Court noted that where relevant in a legal proceeding, "[c]haracter may be established or impeached by evidence of general *reputation.*" *Id.* (emphasis added). Pennsylvania Rule of Evidence 405 expressly allows reputation evidence to establish character: "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony *as to reputation.*" Pa. R.E. 405(a) (emphasis added). Our Supreme Court has, therefore, recognized that reputation may be an indication, or measure, of character.

Reviewing the statutory language in question with this background, we interpret the General Assembly's use of the word "and" between the words "character" and "reputation" in Section 6109(e)(1)(i) as its recognition that the terms are related. We thus read the two words conjunctively—*i.e.*, as a single standard for licensure—and not disjunctively, as Caba argues on appeal. To adopt Caba's construction would require us to recognize a licensure scheme that would allow a man with bad character to hold a license under the Act, so long as the community is oblivious to his bad character. A mob boss could hold a license to carry a concealed weapon, so long as he is not a "reputed" mob boss. We will not adopt such an absurd construction of the Act. *See* 1 Pa.C.S. § 1922; *Capital Acad. Charter Sch. v. Harrisburg Sch. Dist.*, 934 A.2d 189, 193 (Pa.Cmwlth.2007) ("Statutes should receive a sensible construction and should be construed if possible so that absurdity and mischief may be avoided."), *appeal denied*, 596 Pa. 756, 947 A.2d 738 (2008).

■ We also reject Caba's argument that evidence of specific acts cannot be used to establish character under the Act. Though Caba cites this Court's decision in *Harris* to support his argument, *Harris* does not stand for such a broad proposition. In *Harris*, we held that certain testimony by a witness as to events that the witness did not himself witness was inadmissible hearsay and thus could not support a revocation decision under the Act. *Harris*, 675 A.2d at 402–03. Nonetheless, this Court accepted testimony from the witness as to the licensee's general reputation in the community for purposes of upholding the license revocation in that case. *Id.* at 403. Thus, although we held that the particular witness in *Harris* could not speak to specific acts that he did not witness, we did not hold, as Caba argues, that specific acts evidence is never admissible to prove character.

■ Indeed, Rule 405(b) of the Pennsylvania Rules of Evidence provides that specific acts evidence is permitted to establish character in this type of proceeding:

> Specific instances of conduct are not admissible to prove character or a trait of character, *except* as follows:
>
> (1) In civil cases where character or a trait of character is admissible as an element of a claim or defense, character may be proved by specific instances of conduct.

(Emphasis added.) A license revocation proceeding under the Act is civil in nature. Because "character and reputation" is the statutory ground on which the Sheriff's revocation decision was based, it is an element—indeed, the element—of the claim and defense in this case. Moreover, this Court has upheld a license decision under the Act based on a specific instance of bad conduct similar to the instance at issue here. *See Morley v. City of Phila. Licenses & Inspections Unit*, 844 A.2d 637 (Pa.Cmwlth.), *appeal denied*, 581 Pa. 684, 863 A.2d 1150 (2004). Thus, the trial court did not err by allowing testimony of specific instances of conduct by Caba to establish that he lacks the character to possess a license under the Act.

■ Caba also contends that the only evidence of his character and reputation in the community in the record is the testimony of his witness, Mr. Rifas. In its opinion issued pursuant to Pa. R.A.P. 1925(a)(1), however, the trial court noted that it did not find Mr. Rifas' testimony as to Caba's reputation relevant, because Mr. Rifas based his testimony on Caba's reputation in a different community (Lehigh County) five years prior to the hearing in this matter. As our Supreme Court observed in *Hopkins*, reputation can change

over time and vary from community to community. To the extent, then, that Caba's argument can be interpreted as a challenge to the trial court's decision to reject Mr. Rifas' testimony, we find no error.

Finally, Caba argues that the trial court inappropriately limited Caba's cross-examination of Mr. Potts, preventing Caba from challenging Mr. Potts' credibility. With respect to a review of a licensing decision under the Act, this Court has opined:

> [T]he legislature intended Section 6109 of the ... Act to confer discretion on sheriffs and/or police commissioners, depending upon the jurisdiction in question, empowering them to exercise judgment in applying the [A]ct's standards to determine if applicants should be licensed. That principle also applies to the revocation of a license.

*Morley,* 844 A.2d at 640–41 (citation omitted). Here, the trial court heard conflicting testimony from Caba and Mr. Potts as to the incident in Hamburg, Pennsylvania, on November 24, 2010. In its opinion, the trial court found Caba's testimony not credible and credited Mr. Potts' version of events: "[T]his court heard testimony and determined that Mr. Potts was credible, but [Caba] was not." (Trial Ct. Op. at 10.)

As noted above, the only substantive testimony that the Sheriff presented as to the events on the evening of November 24, 2010, was Mr. Potts' testimony. The trial court refused to admit any documentary evidence offered by the Sheriff. In its opinion, the trial court was clear that it upheld the Sheriff's revocation decision based on Mr. Potts' testimony:

> People are presumed to know that they do not search for their weapon, load their guns, brandish their firearms in public, and point them at people following an altercation. This particular incident occurred after the participants had exited a bar that served alcoholic beverages. Such scenarios have often set off a powder keg of emotions, illogical thinking and regretful actions and reactions by either or both parties that too often result in life-taking tragedies when a loaded firearm is brought into the fracas. [Caba] clearly was not defending himself or a loved one during the incident to which Mr. Potts testified.

(*Id.* at 11.)

Mr. Potts was called to the stand on three separate occasions during the hearing. The Sheriff first called Mr. Potts in his case-in-chief. As noted above, Mr. Potts did not offer any material testimony on direct examination during this portion of the hearing. At most, he authenticated a letter he wrote to the District Attorney when he filed a personal criminal complaint against Caba. That letter was not admitted into evidence. On cross-examination, Caba attempted to attack Mr. Potts' credibility:

> Q What is your relationship with Mr. Ryan Stufflet?
>
> A He is my wife's cousin but I don't know him.
>
> . . . .
>
> MR. MOGEL [Sheriff's counsel]: Your Honor, this is the same objection you gave me.
>
> THE COURT: Agreed. Sustained.
>
> MR. PRINCE [Caba's counsel]: Your honor, I have to be able to go into it because it provides the background for why he would say what he said in his reports. There's credibility issues there.

(R.R. 41 a.) The exchange between the Court and Caba's counsel continued, with counsel pressing for the opportunity to cross-examine Mr. Potts to challenge his bias and credibility and the trial court rejecting counsel's requests. (*Id.* 41 a–

42a.) Based on this exchange, Caba argues on appeal that the trial court inappropriately limited his cross-examination of Mr. Potts.[10]

Based on our review of the record, it is clear that the trial court limited Caba's cross-examination of Mr. Potts when Mr. Potts testified as part of the Sheriff's case-in-chief. As noted above, however, that was not the point during the hearing when Mr. Potts testified as to the events of November 24, 2010, which was the testimony on which the trial court relied to uphold the Sheriff's revocation decision. The Sheriff called Mr. Potts as a rebuttal witness later in the proceeding. (R.R. at 47a–49a.) During this portion of the hearing, Mr. Potts testified for the first time as to what he witnessed on November 24, 2010. Caba's counsel cross-examined Mr. Potts. At no point during *that* cross-examination did the trial court limit cross-examination. Mr. Potts answered every question that Caba's counsel asked. After Caba testified, the Sheriff again called Mr. Potts. Mr. Potts testified further about his version of the events on the evening of November 24, 2010. This time, Caba's counsel declined the opportunity to further cross-examine Mr. Potts. (R.R. 50a–51 a.) It, therefore, does not appear from the record that the trial court improperly limited Caba's cross-examination of Mr. Potts.

## II

■ We now turn to Caba's constitutional arguments. "Our law provides a strong presumption that legislative enact-

ments . . . do not violate the Constitution." *Ass'n of Settlement Cos. v. Dep't of Banking,* 977 A.2d 1257, 1261 (Pa.Cmwlth.2009) (en banc). The burden to overcome the presumption is heavy: "[A] statute will not be declared unconstitutional unless it *clearly, palpably,* and *plainly* violates the Constitution. All doubts are to be resolved in favor of finding that the legislative enactment passes constitutional muster." *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth,* 583 Pa. 275, 292, 877 A.2d 383, 393 (2005) (emphasis in original) (citation omitted).

■ To prevail on a facial challenge to a statute, the plaintiff must convince a court that the "constitutional deficiency is so evident that proof of actual unconstitutional applications is unnecessary." *Clifton v. Allegheny Cnty.,* 600 Pa. 662, 705 n. 37, 969 A.2d 1197, 1223 n. 37 (2009). In *Clifton,* the Pennsylvania Supreme Court noted that facial constitutional challenges are generally disfavored, quoting the United States Supreme Court, which opined:

Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "anticipate a question of constitutional law in advance of the necessity of deciding it" nor "formulate a rule of constitutional law broader than is required by the

10. "Where . . . the evidentiary record supports the trial court's credibility determinations, we are bound to accept them." *Samuel–Bassett v. Kia Motors Am., Inc.,* 613 Pa. 371, 34 A.3d 1, 32 (2011), *cert. denied,* —— U.S. ——, 133 S.Ct. 51, 183 L.Ed.2d 677 (2012). If a trial court, however, inappropriately limits cross-examination, the record may be inadequate to support the trial court's

credibility determination. Our Supreme Court has opined: "It is beyond question that the interest in or bias of a witness towards either side of a lawsuit may be exposed upon cross-examination, and that in some instances the blocking of such a line of attack may constitute reversible error." *Downey v. Weston,* 451 Pa. 259, 263, 301 A.2d 635, 639 (1973) (citation omitted).

precise facts to which it is to be applied." Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people."

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (citations omitted) (quoting *Sabri v. United States*, 541 U.S. 600, 609, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004)) (quoting *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (internal quotation marks omitted)) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (internal quotation marks omitted)).

Though, as noted above, all constitutional challenges to statutes are, by their nature, uphill battles, a facial challenge is "the most difficult challenge to mount successfully." *U.S. v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). But an as-applied challenge is less so, because "[a]n as-applied attack ... does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *U.S. v. Marcavage*, 609 F.3d 264, 273 (3d Cir.2010).

**A**

■ Caba challenges the constitutionality of Section 6109 of the Act on its face, arguing that a law that requires an individual to obtain a license to carry a concealed weapon infringes on the right to bear arms guaranteed under the Second Amendment to the United States Constitution and Article I, Section 21 of the Pennsylvania Constitution. (Caba Br. at 49.) Caba urges the Court to hold Section 6109 of the Act to a "strict scrutiny" standard, placing great emphasis on the United States Supreme Court's recent and landmark Second Amendment decisions in *McDonald v. City of Chicago*, — U.S. ——, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), and *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

In response, the Sheriff directs us to prior opinions from this Court, in which we have recognized the constitutionality of Section 6109 of the Act. He directs us primarily to *Morley*, which cites our earlier decision in *Gardner v. Jenkins*, 116 Pa.Cmwlth. 107, 541 A.2d 406 (1988) (en banc). In *Morley*, a licensee sought to overturn the decision to revoke his license under the Act. We noted in that 2004 opinion that the licensee specifically raised for our consideration the question of whether the decision deprived him of his constitutional right to carry a firearm. *Morley*, 844 A.2d at 640. In disposing of that argument, we opined: "[T]his Court has held that although the right to bear arms is a constitutional right, *it is not unlimited*, and restrictions are a proper exercise of police power if they are intended to protect society." *Id.* at 641 (emphasis added); *see also Lehman v. Pa. State Police*, 576 Pa. 365, 377–78, 839 A.2d 265, 273 (2003) ("While the right to bear arms enjoys constitutional protection, like many other constitutional rights, it is not beyond regulation."); *Perry v. State Civil Serv. Comm'n*, 38 A.3d 942, 955 (Pa.Cmwlth. 2011) ("[T]he right to bear arms is not unlimited; it may be restricted in the exercise of police power for the good order of society and protection of citizens."). Our opinion in *Morley* lacks any language expressly holding that Section 6109 of the Act is a restriction that passes constitu-

tional muster. But that conclusion is, nonetheless, implicit in the Court's disposition of the appeal—*i.e.*, affirmance.

*Morley* predates the United States Supreme Court's decisions in *McDonald* and *Heller.* Thus, the question presently before us is whether, in light of *McDonald* and *Heller,* we should find Section 6109 of the Act unconstitutional. In *Heller,* the United States Supreme Court struck down a District of Columbia law that banned the possession of handguns and that further required anyone lawfully possessing a firearm in the home to render the weapon inoperable by either disassembling it or binding it with a trigger lock at all times. The Supreme Court held that both provisions violated the Second Amendment. In so doing, the Supreme Court rejected the contention that the Second Amendment right had a limited purpose tied to those only serving in militias. Rather, the Supreme Court held that "the inherent right of self-defense has been central to the Second Amendment right." *Heller,* 554 U.S. at 628, 128 S.Ct. 2783. In striking down the handgun ban, the Supreme Court noted that the "ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *Id.* The Supreme Court continued: "The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute." *Id.* It then concluded: "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights," the handgun ban "would fail constitutional muster." *Id.* at 628–29, 128 S.Ct. 2783 (footnote omitted). Because the portion of the law that requires homeowners to render firearms in their homes inoperable "ma[de] it impossible for citizens to use them for the core lawful purpose of self-defense," the United States Supreme Court also found this por-

tion of the District of Columbia law unconstitutional. *Id.* at 630, 128 S.Ct. 2783.

In language overlooked by Caba in his brief, however, the *Heller* Court, like this Court in *Morley,* expressly noted that the Second Amendment right, "[l]ike most rights, . . . is not unlimited":

> From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. *For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.*

*Id.* at 626, 128 S.Ct. 2783 (emphasis added) (citations omitted). The *Heller* Court described laws prohibiting concealed carry as "presumptively lawful regulatory measures." *Id.* at 627 n. 26, 128 S.Ct. 2783. Thus, the United States Supreme Court's decision in *Heller* appears to be consistent with our decision in *Morley.*

In *McDonald,* the United States Supreme Court held that the Second Amendment right to keep and bear arms, and the Supreme Court's interpretation thereof in *Heller,* applied to the States: "[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald,* —— U.S. at ——, 130 S.Ct. at 3042. A plurality of the Supreme Court, however, repeated the assurance that the Supreme Court gave in *Heller*—*i.e.,* that the Second Amendment right, applicable to the States through the Fourteenth Amendment, "does not imperil every law regulating firearms." *Id.* at ——, 130 S.Ct. at 3047.

Neither *Heller* nor *McDonald* dealt directly with a challenge to a state's con-

cealed carry law. We see nothing in either decision that causes us to rethink our precedent, upholding the constitutionality of Section 6109 of the Act. To the contrary, the Supreme Court's decisions recognize that concealed carry laws, such as the scheme set forth in the Act, are presumptively valid even under a heightened standard of constitutional scrutiny. *See Heller*, 554 U.S. at 628–29 & n. 27, 128 S.Ct. 2783 (holding it inappropriate to apply rational basis review to laws regulating enumerated constitutional rights).

Caba also directs our attention to a recent decision by the United States District Court for the District of Maryland, *Woollard v. Sheridan*, 863 F.Supp.2d 462 (D.Md.2012). In *Woollard*, the plaintiff challenged a Maryland law that prohibited the carrying of a weapon outside the home, *openly or concealed*, without a permit. The plaintiff challenged the portion of the law that required an applicant for a permit to demonstrate a "good and substantial reason" for the permit. Applying intermediate scrutiny, the district court held that the requirement unconstitutionally infringed on the right to bear arms under the Second Amendment. After recognizing the strong government interests in public safety and the prevention of crime, the district court opined:

> The Maryland statute's failure lies in the overly broad means by which it seeks to advance this undoubtedly legitimate end. The requirement that a permit applicant demonstrate "good and substantial reason" to carry a handgun does not, for example, advance the interest of public safety because ensuring that guns are kept out of the hands of those adjudged most likely to misuse them, such as criminals or the mentally ill. It does not ban handguns from places where the possibility of mayhem is most acute. . . . It does not attempt to reduce accidents. . . . It does not even,

as some other States' laws do, limit the carrying of handguns to persons deemed "suitable" by denying a permit to anyone "whose conduct indicates that he or she is potentially a danger to the public if entrusted with a handgun."

*Woollard*, 863 F.Supp.2d at 474 (quoting *Kuck v. Danaher*, 822 F.Supp.2d 109 (D.Conn.2011)). Finding no relationship between the state's legitimate interests and the requirement that an applicant show a "good and substantial" reason why he should be allowed to exercise a right that is guaranteed by the United States Constitution, the district court held that the requirement was unconstitutional.

Caba suggests that *Woollard* stands for the proposition that any concealed carry statute that vests discretion in the licensing authority is unconstitutional. That simply is not an accurate reading of *Woollard*. Moreover, *Woollard* is of limited utility to Caba in this case for reasons other than the fact that it is not binding precedent in this Court. As noted above, the district court in *Woollard* expressly differentiated the law in Maryland from a provision in Connecticut law that, like Section 6109(e)(1)(i) of the Act, prohibits those who pose a danger to the public from receiving a permit. Moreover, *Woollard* expressly recognized the limits of its ruling in several respects, one of which is particularly on point here: "The Court wishes to emphasize the limits of this decision. . . . [T]he Court does not speak to Maryland's ability to declare that a specific applicant is unfit for a permit because of some particular aspect of the applicant's *character* or history." *Id.* at 475 (emphasis added).

Although the United States Supreme Court has recognized that the right to bear arms protected by the Second Amendment is a fundamental right, it has also expressly recognized that laws limiting/prohibiting

the ability to carry a concealed weapon are presumptively valid. In citing *Heller, McDonald,* and *Woollard,* Caba has identified instances where courts have ruled that the laws regulating the possession of firearms unconstitutionally infringed on this fundamental right. But none of these cases dealt with the scheme at issue in this case, which requires a license only to carry a *concealed* weapon and which prohibits those "likely to act in a manner dangerous to public safety" from obtaining or holding such a license. Caba fails to offer any convincing argument or analysis in his brief to build a bridge between the decisions of unconstitutionality in *Heller, McDonald,* and *Woollard* and his request for a similar declaration with respect to Section 6109. We thus reject Caba's plea to rule that Section 6109 of the Act unconstitutionally infringes on his federal and state right to bear arms.

**B**

Caba contends that his due process rights under the United States Constitution and the Pennsylvania Constitution were violated in the following ways: (a) he was deprived of either a pre- or post-deprivation hearing before the Sheriff; (b) the Sheriff did not investigate the character of Mr. Potts (the man who raised Caba's fitness to hold a license under the Act with the Sheriff); (c) the Sheriff did not investigate Caba's character or reputation; (d) the Revocation Letter did not specify the basis for the revocation; and (e) Caba had to pay a fee to the trial court to determine the basis for the Sheriff's revocation decision.

**1.**

The right to procedural due process only attaches where there is an alleged deprivation of a protected property or liberty interest. *See Davenport v.* *Reed,* 785 A.2d 1058, 1062 (Pa.Cmwlth. 2001). The first question we must answer, then, is whether Caba had a protected property or liberty interest in his license under the Act. From the lack of citation to any precedent from this Court or the Pennsylvania Supreme Court by either party and our own independent research, this appears to be an issue of first impression.

Caba argues that he had a protected property or liberty interest in retaining his license, relying principally on his constitutional right to bear arms, which Caba claims is a fundamental right deserving of due process protection. He then cites a litany of licensing cases, wherein courts have recognized a property interest in licenses to engage in vocations or business activities. These cases are consistent with our Supreme Court's decision in *Lyness v. State Board of Medicine,* 529 Pa. 535, 605 A.2d 1204 (1992), where the Pennsylvania Supreme Court "held that the right to pursue a livelihood or profession was a protected property right, thus triggering the protective mechanism of due process." *Pa. Game Comm'n v. Marich,* 542 Pa. 226, 230, 666 A.2d 253, 255 (1995) (citing *Lyness,* 529 Pa. at 542, 605 A.2d at 1207). Caba also notes that the law recognizes a property interest in a driver's license. *See id.* at 233, 666 A.2d at 257. In light of the United States Supreme Court's decisions in *Heller* and *McDonald,* Caba claims that his license to carry a concealed firearm under the Act is similarly worthy of due process protection.

In opposition, the Sheriff relies on a 2002 decision from the United States District Court for the Eastern District of Pennsylvania in *Potts v. City of Philadelphia,* 224 F.Supp.2d 919 (E.D.Pa.2002). In *Potts,* the licensee, like Caba here, challenged the revocation of his license under the Act on due process grounds. Like the

Sheriff, the licensing authority in *Potts* revoked the licensee for lack of suitable character and reputation under Section 6109(e)(1)(i) of the Act. The district court analyzed the question of whether the licensee had a property interest in his license.

The district court first quoted from a portion of the United States Supreme Court's decision in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), wherein the Supreme Court opined: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. . . . He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents*, 408 U.S. at 577, 92 S.Ct. 2701. The district court then looked to precedent from the United States Court of Appeals for the Third Circuit for the legal principle "that when a state statute confers broad discretion to a licensing body in issuing licenses, an applicant does not have a protected property interest in the license for purposes of procedural due process." *Potts*, 224 F.Supp.2d at 941 (citing *Midnight Sessions, Ltd. v. City of Phila.*, 945 F.2d 667 (3d Cir.1991), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir.2003)). The district court held that Section 6109(e)(1)(i) of the Act "confers broad discretion to the [licensing authority] in making a subjective determination about the fitness and suitability of applicants as well as current license holders." *Id.* In support, the district court cited to this Court's decisions in *Harris* and *Tsokas v. Board of Licenses & Inspections Review*, 777 A.2d 1197 (Pa. Cmwlth.2001), in which the district court claimed, we held that Section 6109(e)(1) of the Act "grants far-reaching discretion to licensing bodies in issuing and revoking

gun permits." *Potts*, 224 F.Supp.2d at 941. Applying the Third Circuit precedent, the district court held that such broad discretion precludes a finding of a property interest—*i.e.*, the licensee cannot have a legitimate claim of entitlement to a license where the statutory scheme for licensing places broad discretion in the licensing authority. *Id.*[11]

For an understanding of the meaning of the terms "property" and "liberty" in relation to due process, we begin this important analysis with the United States Supreme Court's seminal decision in *Board of Regents*:

'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience. . . . (T)hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged.' For that reason, the Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights. The Court has also made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process.

Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries. For the words 'liberty' and 'property' in the Due Process Clause of

11. The Sheriff also cites to decisions from other state and federal jurisdictions that are in accord with the district court decision in *Potts*.

the Fourteenth Amendment must be given some meaning.

*Bd. of Regents,* 408 U.S. at 571–72, 92 S.Ct. 2701 (alterations in original) (footnotes omitted) (quoting *Nat'l Mut. Ins. Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 646, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949) (Frankfurter, J., dissenting)).

The United States Supreme Court proceeded to define, as best it could, a "liberty" interest subject to due process protections:

> 'While this court has not attempted to define with exactness the liberty ... guaranteed (by the Fourteenth Amendment), the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men.' *In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.*

*Id.* at 572, 92 S.Ct. 2701 (emphasis added) (citation omitted) (quoting *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)).

In *Board of Regents,* David Roth (Roth) brought an action in federal district court against his former employer, Wisconsin State University–Oshkosh (WSU). Roth was hired as a political science professor "for a fixed term of one academic year." *Id.* at 566, 92 S.Ct. 2701. This was his first teaching job. At the end of that academic year, WSU informed him that he would not be re-hired. WSU offered no reason for its decision, offered no hearing, and offered no appeal right. Neither state law nor the rules governing WSU faculty provided for any form of protection or appeal right to a non-tenured teacher who was not rehired for a subsequent academic year, like Roth. Roth, nonetheless, contended in his complaint that he was entitled to due process under the Fourteenth Amendment.

"There might be cases," the United States Supreme Court opined, "in which a State refused to re-employ a person under such circumstances that interests in liberty would be implicated. But this is not such a case." *Id.* at 573, 92 S.Ct. 2701. The Court explained:

> The State, in declining to rehire [Roth], did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. For '(w)here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' In such a case, due process would accord an opportunity to refute the charge before University officials. In the present case, however, there is no suggestion whatever that the respondent's 'good name, reputation, honor, or integrity' is at stake.

*Id.* (footnote and citations omitted) (quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)).

Turning to the question of whether Roth had a property interest in his employment, the United States Supreme Court, as it did with "liberty," set out first to define the interest encompassed by the term "proper-

ty". "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests *that a person has already acquired in specific benefits*. These interests property interests—may take many forms." *Id.* at 576 (emphasis added).[12] As an example, the Court noted that a person receiving welfare benefits under certain statutory and administrative eligibility standards has a property interest in the continued receipt of those benefits that is protected by procedural due process. *Id.* The Court also cited several instances where due process rights attached to a *public* employee's interest in continued employment. *Id.* Relying on this precedent, the Court offered the following guidance:

> Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to v[i]ndicate those claims.
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain

benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients ... had a claim of entitlement to welfare payments that was *grounded in the statute defining eligibility for them*. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. *But we held that they had a right to a hearing at which they might attempt to do so.*

*Id.* at 577, 92 S.Ct. 2701 (emphasis added).

Applying this standard, the United States Supreme Court concluded that Roth *did not* have an interest in his continued employment with WSU worthy of due process protection. The Court noted that Roth's interest in his position with WSU was created and controlled by the terms of his employment contract. That contract provided that the relationship would terminate on a fixed date, with no provision for renewal:

> Thus, the terms of [Roth]'s appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment. Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it. In these circumstances, [Roth] surely had an abstract concern in being rehired, but he did not have a property interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment.

*Id.* at 578, 92 S.Ct. 2701 (footnote omitted).

Four years after *Board of Regents*, the United States Supreme Court clarified

---

12. We note here the United States Supreme Court's use of the term "benefit," as opposed to the term "right." As the Court noted in *Board of Regents*, "the Court has fully and finally rejected the wooden distinction be-tween 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights." *Bd. of Regents*, 408 U.S. at 571, 92 S.Ct. 2701.

that damage to reputation alone, at the hands of a governmental actor, is not a sufficient interest to invoke the procedural protections of due process. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). For due process protections to attach, the alleged defamation must occur in the course of some governmental action that "seeks to remove or significantly alter" an interest recognized and protected by state law. *Id.* at 710–11, 96 S.Ct. 1155; *see R. v. Dep't of Pub. Welfare*, 535 Pa. 440, 450–51, 636 A.2d 142, 147 (1994). Moreover, the United States Supreme Court noted: "There are other interests, of course, protected not by virtue of their recognition by the law of a particular State but because they are guaranteed in one of the provisions of the Bill of Rights which has been 'incorporated' into the Fourteenth Amendment." *Paul*, 424 U.S. at 711 n. 5, 96 S.Ct. 1155.

As noted above, the Pennsylvania Supreme Court has recognized that "a license to pursue a livelihood or engage in a profession" and a license to drive are interests to which procedural due process protections attach. *Marich*, 542 Pa. at 231–33, 666 A.2d at 256–57. In *Marich*, the Pennsylvania Game Commission (Game Commission) imposed a one-year license revocation on two hunters as a penalty, after the hunters pled guilty to killing two ducks over the legal limit.[13] The hunters requested a hearing before the Game Commission. A hearing officer from the Game Commission's Bureau of Law Enforcement conducted the hearing. One of the hunters testified, contending that he believed that a "bonus" limit for ducks was still in place. The other testified to relying on the same information. The hearing officer presented the Commonwealth's record in support of revocation. Ultimately, the hearing officer ruled that the "bonus" limit was not in effect and that the hunters failed to produce evidence for mitigation of the penalty imposed by the Game Commission.

The hunters appealed to this Court, and we reversed and remanded. We held, relying on *Lyness*, that the hearing officer acted as both prosecutor and adjudicator in violation of the hunters' due process rights. The Game Commission appealed that decision to the Pennsylvania Supreme Court, arguing that this Court erred because the hunters did not have a protected property or liberty interest in engaging in the sport of hunting. *Id.* at 227–29, 666 A.2d at 254–55.

The Pennsylvania Supreme Court agreed with the Game Commission and reversed. After outlining the governing law, which is also set forth above, the Supreme Court set out to determine "whether hunting is a liberty or property interest to which due process attaches." *Id.* at 230, 666 A.2d at 255–56. It concluded that it was not:

The recreational sport of hunting has not been recognized as a constitutionally protected liberty or property interest by state or federal law. Unlike a license to pursue a livelihood or engage in a profession, . . . no cases have held that the provisions of the federal or state constitutions establish or protect a right to hunt or trap or the right to engage in a particular sport. Moreover, Article I, Section 27 of the Pennsylvania Constitution provides that the Commonwealth shall conserve and maintain the natural resources and the public estate for the benefit of all the people.

. . . .

---

**13.** The Game Commission is expressly authorized to revoke a hunting license if a licensee "[h]as either been convicted or signed an acknowledgment of guilt of violating" the Game and Wildlife Code, 34 Pa.C.S. §§ 101–2965. 34 Pa.C.S. § 2741(b)(1).

We acknowledge that the requirements of due process are not limited to the revocation of professional licenses. A driver's license also cannot be revoked without the procedural due process required by the Fourteenth Amendment. However, we find that an individual's interest in driving an automobile far exceeds the interest involved in the sport of hunting. One cannot assume that every type of license administered by the state is afforded the same constitutional protections.

*Id.* at 231–33, 666 A.2d at 256–57 (citations omitted).[14]

Like the license at issue in *Marich,* the license in this case is not a license to engage in a vocation. But this is where the similarities between *Marich* and this case, for purposes of our constitutional analysis, end. While there is no enumerated constitutional right to hunt, both the United States Constitution and the Pennsylvania Constitution recognize the right of citizens to bear arms. Though the United States Supreme Court has only recently recognized "that individual self-defense is 'the central component' of the Second Amendment right," *McDonald,* —— U.S. at ——, 130 S.Ct. at 3036 (emphasis omitted) (quoting *Heller,* 554 U.S. at 599, 128 S.Ct. 2783), the right to bear arms in defense of self has never seriously been questioned in this Commonwealth. It is an enumerated right predating even the ratification of the Second Amendment. *Heller,* 554 U.S. at 601, 128 S.Ct. 2783 (citing the Pennsylvania Declaration of Rights of 1776). Though our state constitution has changed throughout the history of this Commonwealth, the right to bear arms in defense of self has survived each iteration. Today, the right is set forth in Section 21 of the Declaration of Rights in the Pennsylvania Constitution: "The right of the citizens to bear arms *in defen[s]e of themselves* and the State shall not be questioned." Pa. Const. art. 1, § 21 (emphasis added).

As noted above, however, the right to bear arms is not absolute. In Pennsylvania, the General Assembly has enacted the Act, which limits the *manner* by which a Commonwealth citizen can carry a firearm for purposes of self-defense. Under the Act, a citizen who carries a firearm in a *concealed* fashion without first obtaining a license to do so commits, depending on the circumstances, either third-degree felony of first-degree misdemeanor. 18 Pa.C.S. § 6101(a). For reasons explained above, that law enjoys presumptive constitutionality. But by enacting the licensing scheme for carrying a concealed weapon, the General Assembly created a path by which Commonwealth citizens who meet certain statutory eligibility criteria are entitled to obtain *the benefit* of exercising their constitutional right to bear arms in defense of themselves in a way that is not automatically available to all Commonwealth citizens.

Section 6109(e)(1) of the Act provides:

A license to carry a firearm shall be for the purpose of carrying a firearm concealed on or about one's person or in a vehicle *and shall be issued if,* after an investigation not to exceed 45 days, it

---

14. The Pennsylvania Supreme Court also noted in support of its decision that while the hunters were not entitled to constitutional due process protections, they were entitled to the procedural protections governing adjudications by Commonwealth agencies set forth in the Administrative Agency Law, 2 Pa.C.S. §§ 501–508, 701–704, in challenging the Game Commission's revocation of their licenses. Because Caba does not raise the issue of whether the procedures used by the Sheriff or the trial court in this matter complied with the Local Agency Law, 2 Pa.C.S. §§ 551–555, 751–754, we will not address this issue.

appears that the applicant is an individual concerning whom no good cause exists to deny the license. A license *shall not be issued to any of the following:*

(i) An individual whose character and reputation is such that the individual would be likely to act in a manner dangerous to public safety.

(ii) An individual who has been convicted of an offense under the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act.

(iii) An individual convicted of a crime enumerated in section 6105.

(iv) An individual who, within the past ten years, has been adjudicated delinquent for a crime enumerated in section 6105 or for an offense under The Controlled Substance, Drug, Device and Cosmetic Act.

(v) An individual who is not of sound mind or who has ever been committed to a mental institution.

(vi) An individual who is addicted to or is an unlawful user of marijuana or a stimulant, depressant or narcotic drug.

(vii) An individual who is a habitual drunkard.

(viii) An individual who is charged with or has been convicted of a crime punishable by imprisonment for a term exceeding one year except as provided for in section 6123 (relating to waiver of disability or pardons).

(ix) A resident of another state who does not possess a current license or permit or similar document to carry a firearm issued by that state if a license is provided for by the laws of that state, as published annually in the Federal Register by the Bureau of Alcohol, Tobacco and Firearms of the Department of the Treasury under 18 U.S.C. § 921(a)(19) (relating to definitions).

(x) An alien who is illegally in the United States.

(xi) An individual who has been discharged from the armed forces of the United States under dishonorable conditions.

(xii) An individual who is a fugitive from justice. This subparagraph does not apply to an individual whose fugitive status is based upon nonmoving or moving summary offense under Title 75 (relating to vehicles).

(xiii) An individual who is otherwise prohibited from possessing, using, manufacturing, controlling, purchasing, selling or transferring a firearm as provided by section 6105.

(xiv) An individual who is prohibited from possessing or acquiring a firearm under the statutes of the United States.

Though phrased in the negative, subparagraphs (i) through (xiv) are, in effect, eligibility criteria for the issuance of a license under the Act. These same eligibility criteria are used to revoke a license. *See id.* § 6109(i). A person who meets these eligibility criteria has a legitimate interest in carrying a concealed weapon for self-defense. This is an enumerated, constitutionally-protected interest that, in our view, is worthy of more protection than an interest in engaging in the sport of hunting and no less protection than that afforded to an interest in a driver's license.[15] *See Paul,* 424 U.S. at 711 n. 5, 96 S.Ct. 1155.

---

**15.** That citizens, in any quantity great or *de minimis,* choose not to exercise a particular enumerated constitutional right in a certain way or at all does not diminish the importance of protecting that right for those who choose to exercise it. Not every eligible citizen of this Commonwealth elects to obtain a driver's license. Nonetheless, the United

As the United States Supreme Court opined in *Paul:*

> In each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment.

*Id.* at 711, 96 S.Ct. 1155. In this case, the Sheriff determined that Caba met the eligibility criteria for a license under the Act and issued that license to Caba in 2009. He later revoked Caba's license in August 2011, concluding that Caba no longer possessed the character/reputation necessary to make him eligible for the license. This action by the Sheriff altered or extinguished Caba's right, previously recognized by the law of this Commonwealth, to exercise his constitutional right to carry a firearm in defense of himself in a concealed manner. Following *Paul,* we find that this alteration of Caba's right or status under the law is sufficient to invoke procedural due process protections.

In addition, the reason given by the Sheriff for his action is worthy of attention in this analysis. The Sheriff disqualified Caba from maintaining his license under the Act after concluding that Caba's character/reputation was such that Caba posed a danger to public safety. Under *Board of Regents* and *Paul,* and recognizing that Article I, Sections 1 and 11 of the Pennsylvania Constitution expressly attach due process protections to a citizen's interest in his or her reputation, we hold that the Sheriff's revocation of Caba's license in this case implicated a liberty interest worthy of procedural due process protections. "[D]ue process ... accord[s] an opportunity to refute the charge before" the Sheriff. *Bd. of Regents,* 408 U.S. at 573, 92 S.Ct. 2701.

The Sheriff argues that Caba, however, has no legitimate claim or entitlement to his license under the Act, citing, *inter alia, Potts,* and thus procedural due process protections do not attach to the Sheriff's revocation of Caba's license under the Act. In *Potts,* the federal district court held that a licensee does not have a property interest in his license under the Act because the Act vests in the licensing authority "broad discretion in both issuing and revoking firearm licenses." *Potts,* 224 F.Supp.2d at 941. The licensee in *Potts,* like Caba, was stripped of his license under the Act because the licensing authority found that he was likely to act in a manner dangerous to public safety. Citing the Third Circuit's decision in *Midnight Session,* the district court found that the language of the Act vests such broad discretion in the licensing authority to make the subjective determination about the fitness and suitability of applicants that it cannot be said that applicants or licensees have a "legitimate claim of entitlement" to a license under the Act. Thus, they do not have a property interest protected by procedural due process. The Sheriff also points to this Court's prior decisions in *Harris* and *Tsokas,* wherein we noted the discretion afforded to licensing authorities under the Act.

We start with this Court's precedent in *Harris* and *Tsokas.* Neither case dealt with a challenge to a license revocation under the Act on constitutional grounds.

States Supreme Court and the Pennsylvania Supreme Court have held that those who do make that choice are entitled to procedural due process protections should the government attempt to revoke the license.

The Sheriff and the district court in *Potts* nonetheless relied on our decisions in both cases for the general proposition that the Act confers discretion on licensing authorities to determine whether a license should be granted, denied, or revoked. In *Tsokas*, this Court cited *Harris* to support this proposition. *Tsokas*, 777 A.2d at 1202. In *Harris*, we cited our *en banc* decision in *Gardner*. In *Gardner*, this Court did conclude that licensing authorities have discretion under the Act—*i.e.*, that the issuance of licenses under the Act is not mandatory, but discretionary. We reached this conclusion, however, by relying on language that has since been removed from Section 6109 of the Act:

> Section 6109(a) of the Firearms Act provides:
>
>> [T]he sheriff of a county *may*, upon the application of any person, issue a license to such person to carry a firearm ... if it appears that the applicant has good reason to fear an injury to his person or property, or has any other proper reason for carrying a firearm, and that he is a suitable person to be so licensed. (Emphasis added.)
>
> The language of this section, providing that the sheriff *may* issue a license, shows that the intent of the legislature

was to make such issuance not mandatory, but discretionary in that sheriffs are empowered to exercise judgment in applying the statute's standards to decide if applicants should be licensed.

*Gardner*, 541 A.2d at 407–08 (alteration in original).

This Court decided *Gardner* on May 11, 1988. Approximately seven months later, the General Assembly rewrote Section 6109 of the Act,[16] eliminating the entirety of the version of Section 6109 that this Court analyzed and relied on in *Gardner*.[17] In its place, the General Assembly created new licensing language with material differences for purposes of our analysis in this case:

(1) rather than provide that the licensing authority "may" issue a license, the General Assembly's amended language provided that the license "shall be issued" unless the licensing authority determines that there is "good cause" to deny the license;

(2) the amended language required the licensing authority to act on an application within forty-five days, and if the licensing authority refused to issue the license, it was required to provide written notice of the refusal and "the reasons"[18] for the refusal to the applicant; and

**16.** Act of December 19, 1988, P.L. 1275 (1988 Amendments).

**17.** Prior to the 1988 Amendments, Section 6109 of the Act provided:

(a) Issue of license.—The chief or head of any police force or police department of a city, and, elsewhere, the sheriff of any county, may, upon the application of any person, issue a license to such person to carry a firearm in a vehicle or concealed on or about his person within this Commonwealth for not more than five years from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property, or has any other proper

reason for carrying a firearm, and that he is a suitable person to be so licensed.

. . . .

(d) Revocation.—Any such license to carry firearms *may be revoked* by the person issuing the same. Notice of revocation shall be in writing and shall state the reason therefor. Said notice shall be sent by certified mail, and, at that time, a copy shall be forwarded to the Commissioner of the Pennsylvania State Police.

Act of April 17, 1986, P.L. 82 (emphasis added).

**18.** The General Assembly later amended Section 6109(g), dealing with the grant or denial of a license, and Section 6109(i), dealing with

(3) the General Assembly added twelve eligibility criteria, similar to the fourteen that exist in the current version of the Act.

In June 1998, the General Assembly again amended the Act,[19] specifically Section 6109(i) regarding revocation. The 1998 Amendments added the following emphasized language to the current version of Section 6109(i) of the Act:

> (i) Revocation.—A license to carry firearms may be revoked by the issuing authority for good cause. *A license to carry firearms shall be revoked by the issuing authority for any reason stated in subsection (e)(1) which occurs during the term of the permit.* Notice of revocation shall be in writing and shall state the specific reason for revocation. Notice shall be sent by certified mail, and, at that time, a copy shall be forwarded to the commissioner. An individual whose license is revoked shall surrender the license to the issuing authority within five days of receipt of the notice. *An individual whose license is revoked may appeal to the court of common pleas for the judicial district in which the individual resides.* An individual who violates this section commits a summary offense.

18 Pa.C.S. § 6109(i) (emphasis added). By these amendments, then, the General Assembly added two significant components to the revocation authority under the Act. First, the amendments *mandated* revocation if, during the term of the license, a licensee becomes ineligible for the reasons set forth in Section 6109(e)(1). Second, the amendments provided a licensee the right to appeal a revocation decision to the appropriate court of common pleas.

Although we do not presume to know for certain the General Assembly's motivation for these post-*Gardner* amendments to the Act,[20] the substance of the amendments strongly evidences clear legislative intent to both guide and limit the discretion of the licensing authority with respect to the grant, denial, and revocation of licenses. Denial and revocation are *mandatory*, not discretionary, if the licensing authority finds that certain eligibility criteria are not met. The licensing authority must provide "specific" reasons for a license denial or revocation. And, in the case of a license revocation, the licensing authority's decision is subject to judicial review. *Harris* and *Tsokas* rely on this Court's interpretation of the Act as it existed before the 1988 and 1998 Amendments, as reflected in *Gardner.* The district court in *Potts* did the same. Accordingly, we are not persuaded by the district court's conclusion in *Potts* that the licensing authority's discretion under the Act is so unfettered that

revocation, to require the licensing authority to notify the applicant or licensee of the "specific" reason(s) for the adverse license decision. Act of June 13, 1995, P.L. 1024 (Spec.Sess. No. 1).

**19.** Act of June 18, 1998, P.L. 503 (1998 Amendments).

**20.** *But see Harrisburg Sch. Dist. v. Zogby,* 574 Pa. 121, 128, 828 A.2d 1079, 1083 (2003) (characterizing amendment to law as "an apparent response" to preliminary injunction order); *Pa. State Police v. Pa. State Troopers Ass'n,* 698 A.2d 688, 695 (Pa.Cmwlth.1997)

("No one could reasonably argue that the General Assembly was not acutely aware of the Supreme Court's decision in [*Commonwealth v. State Conference of State Police Lodges of the Fraternal Order of Police,* 525 Pa. 40, 575 A.2d 94 (1990), *superseded by statute,* 71 Pa.C.S. § 5955]. Likewise, no one could reasonably dispute that the responsive action of the Legislature, taken so soon after the Supreme Court's decision, was a direct response to correct what it felt was an erroneous interpretation of its own legislation." (footnote omitted)), *aff'd,* 559 Pa. 586, 741 A.2d 1248 (1999).

Caba had no legitimate claim or entitlement to his license.

■ It is not the existence of discretion that precludes recognition of a property interest, but rather whether that discretion is unfettered and thus unassailable. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 789–90, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005) (noting that "unfettered discretion" that previously existed in law enforcement authorities with respect to enforcement of restraining orders defeated citizen's "legitimate claim of entitlement" to enforcement). Analysis of this question goes back to the United States Supreme Court's decision in *Roth*, where the Court held that Roth did not have a legitimate claim of entitlement to his teaching position because the renewal decision was a matter *solely* within the discretion of his employer, there were no standards governing the exercise of that discretion, the employer did not have to provide any reason for exercising that discretion, and the decision of the employer was *final* and unappealable. *See Roth*, 408 U.S. at 567, 92 S.Ct. 2701.

In this case, Caba had a license. Under the Act, the Sheriff must have "good cause" before he can revoke a license. 18 Pa.C.S. § 6109(i). In other words, he cannot revoke a license as a matter of administrative whim. He must revoke a license if the licensee becomes ineligible, for the reasons set forth in Section 6109(e)(1) of the Act, during the term of the license. *Id.* He also must provide the "specific reason" to the licensee for his revocation decision. *Id.* And, the licensee may appeal the Sheriff's decision to the court of common pleas. *Id.* When a regulatory scheme provides for a review of an adverse governmental decision, this "sheds light on the legislature's intention in conferring a property right on those" with the appeal right.

*Pipkin v. Pa. State Police*, 548 Pa. 1, 7, 693 A.2d 190, 193 (1997).

Moreover, we reject the premise in *Potts*, advanced by the Sheriff in this case, that when the Sheriff determined that Caba lacked the requisite character/reputation to keep his license, the Sheriff was exercising discretion. To the contrary, whether Caba's "character and reputation is such that [he] would be likely to act in a manner dangerous to public safety" is a question of fact. Because he found as fact that Caba lacked the requisite character and reputation, he was required by law *(i.e.*, he had *no discretion)* to revoke Caba's license. On appeal, Caba is entitled to challenge the Sheriff's factual findings. In the context of administrative law, courts review fact finding by the local agency to determine whether substantial evidence in the record supports the finding, not for an abuse of discretion. *See* 2 Pa.C.S. § 754(b). As we explained in *Tsokas*, "[w]hen *the evidence* supports the conclusion that an individual licensed to carry a firearm does not possess the requisite character and reputation to do so, this Court must uphold the decision of a police chief or other proper official to revoke the license." *Tsokas*, 777 A.2d at 1202 (emphasis added).

### 2.

Having determined that Caba was entitled to procedural due process protections when the Sheriff revoked his license under the Act, we must now determine whether Caba received the process he was due. In *In re McGlynn*, 974 A.2d 525 (Pa.Cmwlth. 2009), we explained:

> The fundamental components of procedural due process are notice and opportunity to be heard.
>
> . . . .
>
> ... The concept of due process, however, is a flexible one and imposes

only such procedural safeguards as the situation warrants. Demonstrable prejudice is a key factor in assessing whether procedural due process was denied.

*In re McGlynn*, 974 A.2d at 531–32. Where a protected property or liberty interest is involved, the Pennsylvania Supreme Court directs us to apply "the methodology of the United States Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to assess whether the state action offends the Fourteenth Amendment's due process guarantees." *Marich*, 542 Pa. at 230–31, 666 A.2d at 256. According to our Supreme Court,

> [t]he *Mathews* analysis consists of three distinct factors which much be considered: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements will entail.

*Id.* at 231 n. 7, 666 A.2d at 256 n. 7.

Caba contends that his procedural due process rights were violated in two ways: (1) the notice lacked sufficient specificity, because it only cited the statutory ground for revocation; and (2) he was not afforded a pre- or post-deprivation hearing before the Sheriff. The Sheriff does not respond in his brief to Caba's challenge to the adequacy of the notice. As for a hearing, the Sheriff contends that Caba is not entitled to a pre-deprivation hearing and that the trial court proceeding operated as

Caba's post-deprivation hearing for due process purposes.

"Adequate notice for procedural due process purposes requires *at a minimum* that the notice contain a sufficient listing *and explanation* of the charges against an individual." *Dunn v. Dep't of Transp.*, 819 A.2d 189, 193 (Pa.Cmwlth. 2003) (second emphasis added). The Act contains a notice requirement. In order for the Sheriff to revoke a license under Section 6109(i) of the Act, he must provide the following notice to the licensee by certified mail: "Notice of revocation shall be in writing *and shall state the specific reason for revocation.*" 18 Pa.C.S. § 6109(i) (emphasis added). Here, the Revocation Letter provided the following reason for the revocation: "A person whose character/reputation indicates danger to public safety." The Revocation Letter merely cites the *legal* authority for the Sheriff's decision, paraphrasing one of the statutory bases for revocation (and for denying an initial application for a license). *See id.* § 6109(e)(1)(i) ("A license shall not be issued to . . . [a]n individual whose character and reputation is such that the individual would be likely to act in a manner dangerous to public safety.").

The notice requirement serves an important purpose under the Act. The Act provides for a direct appeal of a revocation to the court of common pleas. To evaluate whether to pursue this statutory remedy, a licensee should be informed of the "specific reason" for revocation, and not simply a general statement that the licensee lacks the requisite character and reputation. Such a vague and nonspecific notice essentially requires a licensee to guess as to the specific reason why the licensing authority has changed its opinion of the licensee's character and reputation since the time it issued the license.[21] When determining

---

**21.** Because a licensing authority may not issue a license to a person whose character and

whether to exercise a statutory right to appeal a license revocation, the licensee must, at a minimum, be made aware of the *specific* reason, and not merely the general legal authority, for the decision.[22] Notice further serves the important function of enabling the licensee, should he choose to challenge the license revocation, to prepare his case. *See Harrington v. Dep't of Transp.*, 563 Pa. 565, 575, 763 A.2d 386, 392 (2000) ("Where a constitutionally protected property or liberty interest is at stake, due process requires sufficient notice of the conduct that forms the basis for a deprivation so that the respondent may adequately prepare a defense." (Footnote omitted)).

Contrast the Revocation Letter in this case with the notice in *Harris*. In that case, Michael T. Harris appealed the trial court's decision upholding the revocation of his license under the Act. Though the issue of the adequacy of the notice was not before the Court in *Harris*, we described the content of the notice in our opinion:

On March 19, 1995, local police officers and agents of the Delaware County Criminal Investigation Division (CID) and the Federal Bureau of Investigation (FBI) stopped a car in which Harris was a passenger, based on information from informants that Harris was involved in criminal activity. . . .

The Sheriff revoked Harris' license to carry a firearm on March 22, 1995, based on information provided to him by the FBI and the CID. *The letter of revocation stated in part that Harris' permit was being revoked because of information received from the FBI and CID which indicated that Harris was involved in an illegal activity in the City of Chester.*

*Harris*, 675 A.2d at 401 (emphasis added). Unlike the notice in this case, the notice in *Harris* clearly identified new information that was brought to the attention of the licensing authority, which "counter[ed] previous findings relating to specified criteria for the original issuance of the license (such as character or reputation that one may act in a manner dangerous to public safety)." *Id.* at 403. In *Harris*, we held that such new information "certainly would be among those factors that may constitute good cause for revocation." *Id.*

---

reputation lead the licensing authority to conclude that the applicant is likely to act in a manner harmful to public safety; the licensing authority must necessarily assess the character and reputation of every applicant.

**22.** It is noteworthy that the Sheriff does not even contend in this matter that Caba had *actual* notice of the specific reasons for the Sheriff's decision before filing his appeal with the trial court, notwithstanding the lack of specificity in the Revocation Letter. When Caba filed his appeal with the trial court, he averred the following:

12. The basis for the revocation is unknown[,] as the Notice of Revocation only states, "A person whose character/reputation indicates a danger to public safety," but fails to provide any meaningful explanation for the underlying basis for the revocation. *See,* Exhibit A.

(R.R. at 10a.) The Sheriff responded:

12. Admitted in part. Denied in part. It is admitted that the revocation is based upon character and reputation grounds. It is denied that this is insufficient pursuant to 18 Pa.C.S.A. [sic] § 6109(i). To the contrary, 18 Pa.C.S.A. [sic] § 6109(i) does not require the specific incidents be listed, only the specific basis for the revocation pursuant to 18 Pa.C.S.A. [sic] § 6109(e)(1).

(R.R. at 21a.) Indeed, assuming *arguendo* that actual notice could remedy a defective written notice under the Act, it does not appear from the record that the Sheriff could make an *actual* notice argument in this appeal. None of the evidence presented to and admitted by the trial court indicates that Caba was even aware of the Sheriff's investigation into his licensing status until he received the Revocation Letter.

The Sheriff made an initial assessment of Caba's character and reputation in 2009, when he issued Caba a license under the Act. Like the licensing authority in *Harris*, the Sheriff became aware of new information that countered his previous finding relating to Caba's character and reputation. It was this additional information that, based on the record created before the trial court, caused the Sheriff to revoke Caba's license. But it was this critical information that was missing from the Revocation Letter. Requiring a licensing authority to provide more specificity than a mere legal citation in a revocation notice, like the licensing authority did in *Harris*, does not seem overly burdensome to us. Moreover, adequate notice of an explanation for the agency action, and not simply the legal authority for the action, enables the licensee to make an educated decision about whether to challenge the action and to prepare a defense to the revocation.

■■■■ Whether the inadequacy of the Revocation Letter entitles Caba to any relief on his due process claim, however, turns on whether Caba has suffered "demonstrable prejudice". Where proceedings are tainted by procedural irregularities, such as the lack of adequate notice, the remedy is a remand for an additional hearing after a new notice. *See Moore v. Dep't of Transp.*, 19 A.3d 1200, 1206 (Pa. Cmwlth.2011); *Turk v. Dep't of Transp.*, 983 A.2d 805, 819 (Pa.Cmwlth.2009).

Thus, to establish a due process violation, a claimant must show prejudice of the type that would call into question the fairness or the outcome of the proceeding below. Otherwise, a remand would serve no purpose other than to duplicate resources and expenses unnecessarily to reach the same result, which would be contrary to the second and third *Mathews* factors.[23]

On prejudice, Caba argues that he was forced to pay a filing fee for his appeal to the trial court and to incur additional attorney's fees to determine (presumably through discovery)[24] the specific reason for the Sheriff's action. (Caba Br. at 39.) He does not, however, argue that the inadequacy of the Revocation Letter impeded his ability to prepare for and participate in the hearing before the trial court. He does not argue that had he received the proper notice in the Revocation Letter, the outcome of the proceedings before the trial court may have been different. Such are the types of prejudice that Caba needed to show in order to prevail on his due process claim. It is the lack of these types of prejudice that precludes us from granting him relief, notwithstanding the clear inadequacy of the Revocation Letter.

■■■ We now turn to Caba's argument that the Sheriff's failure to conduct a pre- or post-deprivation hearing violated due process. It is undisputed that the Sheriff did not conduct any type of hearing before issuing the Revocation Letter. Caba ac-

---

23. Caba does not ask for a new hearing; rather, he seeks outright reversal of the trial court and a judgment in his favor. Because the requested relief "fails to align [with] the appropriate remedy for [the] claimed procedural error," we could reject Caba's due process claim based on inadequate notice on this basis alone, without further discussion. *Turk*, 983 A.2d at 819.

24. Upon our review of the record, it appears that Caba became aware of the specific reasons for the Sheriff's license revocation some-

time after filing his appeal but before the hearing before the trial court, perhaps through the Sheriff's responses to Caba's discovery requests. Although we find it unacceptable that a licensee would ever have to go to such an extent simply to determine the specific reason for an adverse agency action, as noted above, prejudice Caba identifies is not the type of prejudice necessary to succeed in an appeal that challenges the proceedings below on procedural due process grounds.

knowledges in his brief, however, that under certain limited circumstances the need for prompt government action may justify the initial deprivation so long as it is followed by a prompt post-deprivation hearing. (Caba Br. at 36–37.) *See Fed. Deposit Ins. Corp. v. Mallen,* 486 U.S. 230, 240, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988). Though Caba argues that no such exigency existed in this case, we disagree. At the time the Sheriff made his revocation decision, he had information to suggest that Caba, *after the conclusion of a physical altercation outside of a bar,* charged his handgun, raised it above his waist, and pursued Mr. Potts' wife and Mr. Stufflet. With this information, the Sheriff was justified in moving promptly, in the interest of public safety, to revoke Caba's license. Thus, the lack of a pre-deprivation hearing in this case did not violate Caba's due process rights.

 In cases, however, where an agency's impairment of a constitutionally protected property or liberty interest is not preceded by an opportunity to be heard, a prompt post-deprivation hearing must be provided. *Mallen,* 486 U.S. at 241–42, 108 S.Ct. 1780. Caba argues that he was denied a post-deprivation hearing before the Sheriff and thus his due process rights were violated. In response, the Sheriff contends that Caba received a full and fair post-deprivation hearing before the trial court.

The record appears to support Caba's claim that the Sheriff revoked Caba's license under the Act without giving Caba an opportunity to tell his side of the story at the local agency level either before or after the revocation decision. And although the lack of *any* opportunity to be heard before the local agency is troubling,[25] a prompt post-deprivation *de novo* hearing before a trial court can satisfy due process.

In *Commonwealth v. Cronin,* 336 Pa. 469, 9 A.2d 408 (1939), a licensee challenged the suspension of his driver's license on due process grounds, arguing that the administrative proceedings before the agency were so irregular that he was denied his right to due process. At the agency level, the agency head conducted two hearings. During the first hearing, the licensee was advised that the agency had received a report from a police officer, indicating that the licensee had been charged with speeding. The officer, however, did not appear at that hearing. At the second hearing, the officer appeared and testified. Strangely, however, neither the licensee nor his counsel received notice of the hearing. As a result, they did not attend and thus did not have the opportunity to cross-examine the officer. Subsequently, the agency informed the licensee that his license had been suspended for ninety days for speeding.

The licensee in *Cronin* appealed the license suspension to the appropriate court of common pleas and requested a hearing. The court of common pleas conducted a *de novo* hearing. During the hearing, the police officer testified. The licensee's counsel cross-examined the officer at length. The licensee also testified and de-

---

25. *See* 2 Pa.C.S. § 553 ("No adjudication of a local agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard."). As noted previously, Caba does not raise compliance with the Local Agency Law as an issue on appeal. In addition, we are not persuaded by Caba's argument that the Sheriff denied him due process because the Sheriff failed to conduct an investigation before revoking Caba's license. The record clearly shows that the Sheriff, through his office, conducted an investigation. Caba's complaint about the adequacy of that investigation does not rise to the level of a due process claim.

nied that he was speeding. The common pleas court found as fact that the licensee had been speeding and thus violated the law, and it upheld the suspension decision. The licensee appealed that decision to the Pennsylvania Supreme Court, raising his due process argument.

The Pennsylvania Supreme Court affirmed. The Court noted that the law then in effect regarding driver's license suspensions afforded the licensee a right to appeal the agency decision to the appropriate court of common pleas. With respect to the proceedings before the common pleas court, the Pennsylvania Supreme Court opined:

> "[I]t is the duty of the court to hear de novo the witnesses of the commonwealth and the witnesses of the licensee, and, from the testimony taken, to determine anew whether the operator's license should be suspended." At such hearing neither the action of the Secretary nor the testimony taken before his representative is properly part of the record of the case. In these respects the proceeding resembles that followed on appeal from a judgment obtained before a justice of the peace, or a magistrate[.]

*Cronin*, 336 Pa. at 473, 9 A.2d at 411 (quoting *Commonwealth v. Funk*, 323 Pa. 390, 186 A. 65 (1936)). Because the common pleas court in *Cronin* conducted such a *de novo* hearing, the Pennsylvania Supreme Court held that the licensee received all of the process he was due:

> It is our conclusion that the hearing de novo in the court below protected defendant against an arbitrary exercise of power on the part of the Secretary. It gave defendant his day in court, and with it the right to present every available defense which he possessed against the suspension of the license. Regardless of whether he was accorded a proper hearing before

the Secretary, it is certain that the hearing de novo remedied the infringement of any constitutional right of which defendant may have been deprived.

*Id.* at 474, 9 A.2d at 411.

In *Grindlinger v. Department of Transportation*, 7 Pa.Cmwlth. 347, 300 A.2d 95 (1973), another driver's license suspension case, the agency suspended a driver's license for sixty days because the licensee had accumulated excessive points through a series of violations. The agency, however, did not provide notice or an opportunity to be heard in an administrative hearing prior to imposing the suspension. On appeal to the appropriate court of common pleas, the court held a *de novo* hearing and subsequently affirmed the agency's suspension decision. The licensee appealed, arguing that he should have first been afforded an administrative hearing under principles of due process. This Court rejected that argument and affirmed the common pleas court: "[T]he de novo hearing ... cured any procedural due process defects which might have been caused by the lack of an administrative hearing." *Grindlinger*, 300 A.2d at 96.

In *Chartiers Valley Industrial & Commercial Development Authority v. City of Pittsburgh*, 131 Pa.Cmwlth. 44, 569 A.2d 405, *appeal denied*, 525 Pa. 659, 582 A.2d 325 (1990), a property owner appealed to the court of common pleas from a default judgment entered by the local agency then in charge of adjudicating violations of ordinances in the City of Pittsburgh. The common pleas court conducted a trial *de novo* and entered a judgment in favor of the City of Pittsburgh for the ordinance violations. The common pleas court also denied a post-trial motion for a new trial. On appeal to this Court, the property owner argued, *inter alia*, that its due process rights were violated because it did not

receive notice of the hearing before the local agency and thus it was denied its opportunity to appear and be heard. We rejected this argument:

> We find no merit in appellant's due process claim. Appellant's complaint of improper notice regarding its hearing before the [local agency] would be valid were it not for the fact of the trial de novo. Appellant has enjoyed an opportunity to be heard on all the issues it wished to raise. Whatever it may have suffered by its absence from the proceedings before the [local agency] has undoubtedly been cured by the full and fair treatment appellant received in the bench trial conducted by the Allegheny County Court of Common Pleas.

*Chartiers Valley*, 569 A.2d at 408.

Based on this precedent, we reject Caba's argument that the lack of a post-deprivation hearing before the Sheriff deprived him of due process. His argument would be valid were it not for the fact of the hearing *de novo* before the trial court. In the *de novo* proceeding, the trial court appropriately placed the burden of proof and ultimate burden of persuasion on the Sheriff to justify his revocation decision. (R.R. at 34a.) The trial court considered only the evidence placed before it on the record and made weight and credibility determinations. Caba had a full and fair opportunity to call witnesses, admit exhibits, and cross-examine witnesses. There is no indication in the record that the trial court showed any bias in favor of the Sheriff or against Caba. Thus, whatever prejudice Caba may have suffered by the absence of a hearing before the Sheriff

was cured by the full and fair treatment he received in the *de novo* hearing conducted by the trial court.[26]

In short, looking at the three *Mathews* factors, we conclude that though he had a substantial private interest in maintaining his license under the Act, Caba became aware of the specific reasons for the revocation at some point prior to the hearing *de novo* before the trial court and had a full and fair opportunity to challenge the Sheriff's evidence and to present his own evidence and argument at that proceeding before an impartial tribunal. Caba does not argue that any irregularities in procedure prevented him from having a full and fair opportunity to be heard by the trial court. Thus, we are not convinced that had the process unfolded below as Caba wishes it would have, the result would have been any different. Therefore, Caba cannot prevail on his due process argument.

### C.

Caba argues that Section 6109(e)(1)(i) of the Act is unconstitutional on its face because it violates the Equal Protection Clause of the Fourteenth Amendment. He claims that the statutory standard of "character and reputation" is so vague that it invites unequal application of the law by licensing authorities (sheriffs and/or chiefs of police) across the Commonwealth. Caba also challenges the law as applied in his case, arguing that he is being treated differently under similar circumstances to those of a potential applicant for a license.

Section 6109(e)(1)(i) of the Act is facially non-discriminatory. The standards for li-

---

**26.** In this case, Caba received the post-deprivation *de novo* hearing approximately five months after the Sheriff issued the Revocation Letter. We do not here decide the question of whether this hearing was "prompt" for due process purposes, because Caba does not raise this issue. Moreover, we reject as baseless Caba's argument in his brief that the lack of any provision in the Act requiring a post-deprivation hearing within a specific period of time renders the Act facially unconstitutional.

censure and revocation apply to any person who wishes to avail himself of the licensing provisions under the Act. Caba's vagueness argument would be stronger if Section 6109(e)(1)(i) vested in the licensing authority the power to revoke a license under the Act if a licensee lacks the "character and reputation to maintain it." But the General Assembly provided greater guidance, curbing the discretion afforded to licensing authorities to revoke a license under this provision of the Act.

In order to justify revocation, the undesirable trait must be one that causes the licensing authority to conclude that the licensee is "likely to act in a manner dangerous to public safety." 18 Pa.C.S. § 6109(e)(1)(i). For example, the licensing authority may conclude, after an investigation, that a licensee is a reputed liar and philanderer, thereby establishing the licensee's poor reputation and lack of character. These traits, however, do not necessarily support a conclusion that the licensee is "likely to act in a manner dangerous to public safety." *See id.* In reviewing the statutory language in its entirety, we believe that this language provides sufficient notice and guidance to licensees and applicants to enable them to determine what character and reputational traits would support denial or revocation under this provision of the Act. *See McGowan v. Maryland,* 366 U.S. 420, 428, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).[27]

But perhaps the most compelling reason to reject Caba's equal protection arguments is the absence of any foundational contention that he has been treated differently than a similarly-situated licensee (or applicant). This is the hallmark of any equal protection claim. *See Correll,* 726 A.2d at 430. In his brief, Caba directs us to his summary conviction for harassment. He notes that under the Act, an applicant with a summary conviction would not be prohibited from obtaining a license, because a summary conviction is not a disqualifying criminal charge under the Act.[28] Thus, Caba reasons, he is being treated differently than an applicant for a license, giving rise to an equal protection claim.

We reject Caba's argument because it is based on a flawed premise. The Sheriff did not suspend Caba's license because he was found guilty of a summary violation. The Sheriff suspended Caba's license, and the trial court upheld the suspension decision, because Caba, after a fight had concluded, reached for his handgun, charged (loaded) it, and gave chase to two individuals with his gun raised to his waist. Based on Caba's *conduct,* the Sheriff determined, and the trial court agreed, that Caba's "character and reputation [was] such that [he was] likely to act in a manner dangerous to public safety." (Trial Ct. Op. at 11–12.) Accordingly, Caba's comparison of his situation to that of an unidentified licensee convicted of an unspecified sum-

---

**27.** Though we realize that from county to county licensees might sometimes be treated differently when it comes to revocation under the Act, such is the nature of any scheme that places some level of discretion in the decision maker. But "[i]f this were a violation of equal protection, all those receiving treatment harsher than some statistical average could mount successful constitutional challenges.... The absurdity of such a notion is self-evident[.]" *Correll v. Dep't of Transp.,* 726 A.2d 427, 431 (Pa.Cmwlth.1999), *aff'd,* 564 Pa. 470, 769 A.2d 442 (2001).

**28.** Under Sections 6109(e)(1)(viii) and 6109(i) of the Act, a licensing authority may not issue a license to, and must revoke a license from, "[a]n individual who is charged with or has been convicted of a crime punishable by imprisonment for a term exceeding one year except as provided for in section 6123 (relating to waiver of disability or pardons)." 18 Pa.C.S. §§ 6109(e)(1)(viii) and 6109(i).

mary conviction does not give rise to an equal protection challenge.

For these reasons, we conclude, as the trial court did, that Caba has failed to allege a valid basis for an equal protection challenge to the Sheriff's revocation decision under the Act. Consequently, we find no error in the trial court's refusal to compel the Sheriff to respond to Caba's interrogatories and document requests, relating to his baseless equal protection claim.

### CONCLUSION

For the reasons set forth above, we affirm the order of the trial court, overruling and denying Caba's appeal from the Sheriff's revocation decision under the Act.

### *ORDER*

AND NOW, this 4th day of February, 2013, the order of the Court of Common Pleas of Berks County is AFFIRMED.