J-S30036-24

2024 PA Super 292

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
WALTER JENKINS :
:
Appellant : No. 1628 MDA 2023

Appeal from the Judgment of Sentence Entered October 16, 2023
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0002930-2022

BEFORE: PANELLA, P.J.E., SULLIVAN, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED: DECEMBER 9, 2024**

Appellant, Walter Jenkins, appeals from the judgment of sentence entered in the York County Court of Common Pleas on October 16, 2023. After a careful review, we affirm.

The relevant facts and procedural history are as follows: On January 13, 2022, a shooting occurred outside of a bar and lounge in York, Pennsylvania. Appellant and his co-defendant, Flair Lamont Griggs, were each charged with Attempted Homicide and Persons not to Possess a Firearm[1] in connection with the shooting.

Appellant filed a motion to dismiss the Persons not to Possess charge under 18 Pa.C.S. § 6105, arguing the statute violated the Second Amendment

_____

[*] Former Justice specially assigned to the Superior Court.
[1] 18 Pa.C.S. § 2501; 18 Pa.C.S. § 6105.

and the Pennsylvania Constitution as applied to him where there was no historical tradition of disarming those considered to be fugitives from justice or those not convicted of violent felonies. After the parties each filed a memorandum and a reply, the trial court denied Appellant's motion.

A consolidated trial was held from September 11 to September 14, 2023.[2] The Commonwealth presented the testimony of the victim, Yandel Gonzalez-Rodriguez, witness, Davaughn White, and numerous police officers, detectives, and medical and forensics experts.

Yandel Gonzalez-Rodriguez testified that he was at the M & M Lounge with his uncle the night of January 12 into January 13, 2022. When they left around 2:00 a.m. and his uncle got into his car, another car drove past them and the victim was shot in the arm and back. N.T. at 115-20. He suffered a fracture which required surgery to place screws, wires, and metals in his upper arm, a collapsed lung which required insertion of a chest tube, and damage to the radial nerve which affects arm and hand movement. N.T. at 404-409.

Davaughn White, Griggs' cousin, had driven Appellant and his co-defendant to the M & M Lounge around midnight on the night of the shooting. The three left around last call and entered White's vehicle, a silver Acura. N.T. at 181-185. White drove them around for some time circling the block as they continued drinking. In an alleyway outside M & M Lounge, either Appellant or

_____

[2] Co-defendant, Flair Lamont Griggs, while not a party to this appeal, appealed his convictions to this Court at docket 1604 MDA 2023.

his co-defendant told White to stop the car. When he did, both passengers jumped out of the vehicle and returned moments later, telling him to drive. White did not see what occurred but thought he heard gunshots. N.T. at 192-197.

Video footage from the M & M Lounge confirmed that Appellant, his co-defendant, and the victim were present at the bar on the night of the shooting. N.T. at 189. The police accessed video footage from several nearby buildings which shows White's silver Acura circling the block outside M & M Lounge at the time of the shooting, and Appellant and his co-defendant exiting the vehicle and returning shortly thereafter. N.T. at 295-96, 422-24.

Officers collected sixteen shell casings from the alleyway where the shooting occurred. N.T. at 285. Ballistics testing by the Pennsylvania State Police revealed that five shots were fired from one 9mm firearm, and eleven shots were fired from another 9mm firearm. N.T. at 141-42. During a warranted search of Appellant's home located at 651 West Market Street, two firearms were found. One firearm, a black and gold gun, was identified as having fired the five spent casings. N.T. at 341-43, 375-76. The second gun found in his home was not the firearm from which the eleven shots were fired; the other gun used in the shooting was never recovered or identified.

At trial, Detective Daniel Kling testified that on April 25, 2019, a warrant was issued for a parole violation for Appellant. Additionally, a felony arrest warrant had been issued against Appellant on December 20, 2021. Both

warrants were still outstanding on the date of the shooting and were served on Appellant January 28, 2022, during the warranted search of his residence. N.T. at 729-30. The 2019 warrant listed Appellant's address as 371 West North Street, Apt. 2., and the 2021 warrant listed Appellant's address as 651 West Market Street. N.T. at 732. Detective Kling testified that in his experience, anyone placed on parole is given notice of the conditions of their parole. N.T. at 735. He also testified that warrants are mailed to the last known address of a defendant. N.T. at 734.

At the conclusion of trial, a jury convicted Appellant of Attempted Homicide and Persons not to Possess a Firearm. Appellant was sentenced to twenty to forty years for the Attempted Homicide conviction and fourteen to twenty-eight months for Persons not to Possess, resulting in an aggregate of 254 to 508 months' incarceration. Appellant filed a Notice of Appeal on November 29, 2023, and a Rule 1925(b) statement on December 20, 2023. This appeal follows.

> Appellant raises these two issues for our review:
>
> Issue One: Was the evidence insufficient to convict Walter Jenkins of possession of a firearm in violation of 18 Pa.C.S. §6105 where the Commonwealth failed to prove beyond a reasonable doubt that Jenkins was a "fugitive from justice" so as to disqualify him from legally possessing a firearm?
>
> Issue Two: Did the lower court err in refusing to dismiss Jenkins' charge under Section 6105 for violating the United States and Pennsylvania Constitutions where the statute regulates conduct protected by these constitutional provisions and the Commonwealth failed to establish that this restriction is consistent with this Nation's history of firearm regulation?

Appellant's Br. at 4.

Issue One

Appellant's first issue challenges the sufficiency of the evidence that he was a fugitive from justice and thus prohibited from possessing a firearm.[3] Our standard of review for Appellant's instant claim challenging the sufficiency of the evidence is well-settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

***Commonwealth v. Brockman***, 167 A.3d 29, 38 (Pa. Super. 2017) (citation omitted). "Evidentiary sufficiency is a question of law and, therefore, our standard of review is *de novo* and our scope of review is plenary."

_____

[3] The trial court failed to address Appellant's sufficiency of the evidence issue and found it waived for not being raised in a post-sentence motion. Tr. Ct. Op. at 2. It is well-established that a challenge to the sufficiency to the evidence need not be raised in a post-sentence motion to be preserved for appellate review.

*Commonwealth v. Sanchez*, 36 A.3d 24, 37 (Pa. 2011) (citing

*Commonwealth v. Meals*, 912 A.2d 213, 218 (Pa. 2006)).

In order to convict Appellant for Persons not to Possess a Firearm under

18 Pa.C.S. § 6105(c)(1), the Commonwealth must have shown that Appellant

was a "fugitive from justice" when he possessed a firearm on the night of the

shooting. The statute states:

> *(a) Offense defined.*
> (1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.
> . . .
> *(c) Other Persons. In* addition to any person who has been convicted of any offense listed under subsection (b), the following persons shall be subject to the prohibition of subsection (a):
> (1) A person who is a fugitive from justice. This paragraph does not apply to an individual whose fugitive status is based upon a nonmoving or moving summary offense under Title 75 (relating to vehicles).

18 Pa.C.S. § 6105(a), (c) (emphasis in original).

The Pennsylvania Supreme Court has analyzed the definition of "fugitive

from justice" as it is used in section 6105 as follows:

> As we have seen, Black's Law Dictionary defines fugitive as:
>
> > (1) Someone who flees or escapes; a refugee.
> > (2) A criminal suspect or a witness in a criminal case who flees, evades, or escapes arrest, prosecution, imprisonment, service of process, or the giving of testimony, esp. by fleeing the jurisdiction or hiding
>
> In addition, Merriam-Webster's Dictionary defines "fugitive" as:

> (1) a person who flees or tries to escape: such as
> > (a) a person who flees a country or location to escape danger (such as war) or persecution : REFUGEE
> > (b) a person (such as a suspect, witness or defendant) involved in a criminal case who tries to elude law enforcement especially by fleeing the jurisdiction
> > — called also *fugitive from justice*
>
> The foregoing definitions make clear that the terms "fugitive" and "fugitive from justice" are synonymous for our present purposes and include someone who evades the law or prosecution, and/or an individual in a criminal case who simply eludes law enforcement. In addition, our Rules of Civil Procedure provide a bench warrant may be issued by a court when a party fails to appear at a required hearing or court-mandated appointment, *i.e.* when the individual fails to comply with a court order to appear. *See* Pa.R.C.P. 1910.13-1 (court may issue bench warrant for arrest for failure to appear pursuant to order of court). Consequently, a bench warrant issues only when an individual does not appear when required, and thus acts to elude or evade law enforcement or prosecution. It logically follows that an individual who evades law enforcement such that a bench warrant is issued — as appellant stipulated to doing here — is a fugitive as that term is commonly defined.

**Commonwealth v. Smith**, 234 A.3d 576, 585 (Pa. 2020) (emphasis in original) (internal hyperlink and citations omitted).

Appellant argues that the mere issuance of a bench warrant against an individual is not itself sufficient to deem that person a fugitive from justice. Appellant submits that it is *only* because the **Smith** defendant stipulated to the existence of the warrant—and thus conceded his awareness of it—that the bench warrant sufficed to deem him a fugitive from justice. Appellant's Br. at 16. Since there was no such stipulation in this case, Appellant argues that evidence of a bench warrant against him is insufficient to prove he knew he was being sought by law enforcement.

Appellant points to the **Smith** Court's emphasis on the defendant's stipulation in that case. The Court called the stipulation "the central piece of evidence" and stated, "[b]y agreeing to the stipulation, appellant also assented to the facts supporting it, and obviated the Commonwealth's burden to demonstrate that underlying fact." **Smith**, 234 A.3d at 579 n.2. However, a stipulation is voluntary and will not always be present. Therefore, where, as here, there is no agreement to a stipulation, the burden remains with the Commonwealth to demonstrate the existence of the warrant and the underlying facts supporting it.

Here, the Commonwealth proved the existence of the warrants against Appellant. The jury heard testimony from Detective Kling that on April 25, 2019, a warrant was issued for a parole violation for Appellant, and on December 20, 2021, a felony arrest warrant had been issued against Appellant. Both warrants were still outstanding on the date of the shooting. N.T. at 729-30; Com. Ex. 101; Com. Ex. 99. The 2019 warrant listed a previous address of Appellant's, and the 2021 warrant listed the home address where Appellant and his firearms were located during the search of the residence after the shooting. N.T. at 732. The warrants were certified by the Clerk of Courts.

Regarding the 2019 bench warrant for Appellant's parole violations, Appellant was aware of the conditions and length of his parole and would have been aware of his numerous violations leading to the issuance of the warrant.

The Petition for Parole Violation reveals that with more than a year left before his maximum expiration date, Appellant ceased contact with the Adult Probation and Parole Department. **See** Petition for Violation at 1, 3. "Appellant's failure to comply with reporting requirements was an evasion of law enforcement." **Smith**, 234 A.3d at 586. Appellant had failed to report, avoided contact, and ignored emails for more than nine weeks, resulting in the department petitioning for a warrant. Finally, and maybe most relevantly, one of the conditions Appellant violated was "Moving without Permission." Appellant could not be located at his listed and approved address, and did not timely seek permission from the department to move to another address. Appellant cannot benefit from evading law enforcement by claiming he didn't receive notice to an address from which he was not legally permitted to move. **See Commonwealth v. Johnson**, 764 A.2d 1094, 1096 (Pa. Super. 2000) ("a defendant cannot benefit in any manner from his own decision to flee from justice").

Regarding the December 20, 2021 felony arrest warrant, the address listed for Appellant was 651 West Market Street. Following the shooting at M & M Lounge, a warrant was executed on January 28, 2022 for 651 West Market Street. During the search which occurred around 8:00 am, Appellant was found sleeping on a futon in a bedroom, and his belongings including U.S. currency, a phone, clothing, and the firearm used in the shooting were recovered. N.T. at 308-10, 336-37. The jury could have believed that

Appellant, who was still residing at 651 West Market Street five weeks after an arrest warrant was issued for him at that location, would have received mail at that address.

Appellant had multiple warrants, one which was active for several years and one which stemmed from a felony investigation just five weeks before Appellant's arrest. The jury was free to make reasonable inferences based on the testimony and evidence and conclude that Appellant's warrants were mailed to his residences and that he was put on notice. Therefore, we conclude that the evidence, viewed in the light most favorable to the Commonwealth, was sufficient for a jury to believe that Appellant was a fugitive from justice and was thus a Person not to Possess a Firearm on the date of the shooting.

Issue Two

In Appellant's second issue, he asserts that the trial court erred in not dismissing his Persons not to Possess charge because section 6105 is unconstitutional as applied to him. More specifically, Appellant contends that section 6105 violates his rights under the Second Amendment of the United States' Constitution, as well as under Article 1, Section 21 of the Pennsylvania Constitution, in light of **New York State Rifle & Pistol Association, Inc. v. Bruen**, 597 U.S. 1, (2022). Appellant's Br. at 19.

A challenge to the constitutionality of a criminal statute presents us with "a pure question of law for which our standard of review is *de novo*, and our

scope of review is plenary." ***Commonwealth v. Collins***, 286 A.3d 767, 775

(Pa. Super. 2022). Our review is guided by the following:

> [A] statute is presumed to be constitutional and will only be invalidated as unconstitutional if it clearly, palpably, and plainly violates constitutional rights. [A] defendant may contest the constitutionality of a statute on its face or as-applied. A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right. A criminal defendant may seek to vacate his conviction by demonstrating a law's facial or as-applied unconstitutionality.

***Commonwealth v. Bradley***, 232 A.3d 747, 756-57 (Pa. Super. 2020)

(citation omitted). "If there is any doubt that a challenger has failed to

[demonstrate the] high burden [of establishing the unconstitutionality of a

statute], then that doubt must be resolved in favor of finding the statute

constitutional." ***Collins***, 286 A.3d at 785 (citation omitted).

The Second Amendment states, "A well-regulated Militia, being

necessary to the security of a free State, the right of the people to keep and

bear Arms, shall not be infringed." U.S. CONST. AMEND. II. In ***New York State***

***Rifle & Pistol Association, Inc. v. Bruen***, 597 U.S. 1, (2022),[4] the United

---

[4] The question before the Court was whether New York's licensing application process, which required applicants to show proper cause to carry a concealed handgun in public, violated the Second and Fourteenth Amendment rights to bear arms for self-defense of law-abiding citizens. The Court held that it did because it prevented law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms in public for self-defense. ***Bruen,*** 597 U.S. at 71.

- 11 -

States Supreme Court clarified the standard courts should apply when evaluating whether a modern firearm regulation violates the Second Amendment and directed courts to examine the "historical tradition of firearm regulation." *Id.* at 17. If an individual is part of "the People" whom the Second Amendment protects, a reviewing court must first decide whether the text of the Second Amendment applies to the individual's proposed conduct or course of conduct. *Id.* at 24, 32. If so, the second question is whether the government has justified the firearm regulation by demonstrating that it is consistent with this nation's historical tradition of firearm regulation. *See id.* at 17.

*Bruen* Step One

Pursuant to ***Bruen***, the initial inquiry is if Appellant is part of "the people" whom the Second Amendment protects, and if his proposed conduct is covered by the plain text of the Second Amendment. ***Bruen***, 597 U.S. at 24, 32.

***Bruen*** did not directly decide the issue of who "the people" are who may lawfully possess a firearm under the Second Amendment. The ***Bruen*** Court made abundantly clear in its decision that the petitioners in that case were "ordinary, law-abiding adult citizens" who are undisputedly "part of 'the people' whom the Second Amendment protects." *Id.* at 31-32. Because it was undisputed, the Court did not discuss it further. The Court then turned to the plain text of the Second Amendment to determine if it protected the

petitioners' proposed course of conduct. Because the petitioners were law-abiding citizens requesting to carry handguns in public for self-defense, the Court held that it does. *Id.* at 32.

Similarly, in a recent Pennsylvania Supreme Court case, ***Barris v. Stroud Twp.***, 310 A.3d 175 (Pa. 2024), the Court briefly discussed this preliminary inquiry. In addressing whether that petitioner was part of "the people" protected by the Second Amendment, the Court stated:

> There has never been any suggestion during this lengthy litigation that [petitioner] is not part of "the people," nor is there evidence he seeks to use anything other than the type of "arms" the Second Amendment plainly protects. So, to the extent ***Bruen*** demands consideration of these preliminary matters (which is not at all clear to us), we nevertheless find them satisfied and advance onward.

*Id.* at 204. Thus, because it was undisputed that the petitioner, a law-abiding citizen who was requesting to train with firearms on his property, was covered by the Second Amendment, the Court went onto the next part of the ***Bruen*** analysis, defining the petitioner's proposed course of conduct.

Here, however, it is disputed whether Appellant, who was a fugitive from justice, was part of "the people" to whom the Second Amendment applies at the time of the shooting. There is also a question as to what Appellant's proposed course of conduct is, or what his conduct was, that he claims has protection under the Second Amendment.

The Commonwealth argues that Appellant is not among "the people" to whom Second Amendment protections apply because the Second Amendment

applies to "responsible,[5] law-abiding citizens," which Appellant is not, given his status as a "fugitive from justice." Appellee's Br. at 18, 21. The Commonwealth points out that in the United States Supreme Court's recent seminal opinions in Second Amendment cases, the Court has consistently limited its recognition of Second Amendment rights to "law-abiding citizens." Appellee's Br. at 18-19 (citing **District of Columbia v. Heller**, 554 U.S. 570, 635 (2008); **McDonald v. City of Chicago**, 561 U.S. 742, 786 (2010); **Bruen**, 597 U.S. at 10, 15, 26, 29, 31, 38, 60, 71 (2022)). The Commonwealth's memorandum in opposition to Appellant's motion to dismiss lists Appellant's conduct leading up to shooting, during the time when his status was a fugitive from justice, to demonstrate that the Second Amendment does not apply to his conduct. **See** Commonwealth's Memorandum in Opposition, 9/5/23, at 2-3, 17-18.

Appellant argues that the Second Amendment applies to "the people," which refers to all members of the national, political community, not an unspecified subset. Appellant's Br. at 26. He argues that the Supreme Court's references to "law-abiding citizens" were merely *dicta* and unnecessary to the

---

[5] In **Rahimi**, the Court clarified that their use of the word "responsible" in previous cases was used "to describe the class of ordinary citizens who *undoubtedly* enjoy the Second Amendment right." **Id.** at 1903 (emphasis added). The Court noted that in **Bruen** and **Heller**, the question of if the Second Amendment only protects "responsible" citizens was not presented, but rejected the "contention that [defendant] may be disarmed simply because he is not 'responsible.'" **Id.**

dispositions of those cases. *Id.* at 28-29.[6] Regarding if Appellant's proposed course of conduct is covered by the text of the Second Amendment, the threshold question in the *Bruen* inquiry, Appellant's brief is silent. In his motion to dismiss the Persons not to Possess charge, he briefly states that since the Second Amendment unquestionably covers possessing firearms inside or outside the home, and since section 6105 prevents certain individuals such as Appellant from possessing a firearm, section 6105 abridges conduct protected under the Second Amendment. Motion to Dismiss, 7/5/23, at ¶ 14.

There is an apparent distinction between how the *Bruen* steps are applied in cases where the Court referred to the petitioner as undoubtedly "law-abiding," and cases where, like here, the defendant had some criminal status which was an impediment to his right to bear arms. Recently, the United States Supreme Court issued a seminal decision in *United States v. Rahimi*,

_____

[6] In his brief, Appellant heavily relies on *Range v. AG United States*, 69 F.4th 96 (3d Cir. 2023) (vacated and remanded by *Garland v. Range*, 144 S. Ct. 2706 (2024)). In that case, the defendant had been prohibited under federal law from possessing a firearm because he was convicted for making a false statement, a misdemeanor punishable by up to five years' imprisonment. *Id.* at 98. In finding the statute unconstitutional as applied to the defendant, the court rejected the notion "that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment" and found no history of disarming people situated similarly to the defendant. *Id.* at 103, 105. While this Court would not have been bound by this decision, on July 2, 2024, after the parties in this case submitted their briefs, *Range* was vacated and remanded in light of the United States Supreme Court decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), discussed *infra*. We commend Appellant's counsel for his post-submission communication to our Court notifying us that *Range* had been vacated and remanded.

144 S. Ct. 1889 (2024), upholding a firearm regulation as constitutional on a historical basis. *Rahimi* is instructive on delineating the process for applying the *Bruen* steps.

In *Rahimi*, the defendant was subject to a domestic violence restraining order which prohibited him from possessing a gun under 18 U.S.C. § 922(g)(8). *Rahimi*, 144 S. Ct. at 1994. Thus, the *Rahimi* case presented a circumstance where the defendant was not undoubtedly a "law-abiding" citizen. Under that circumstance, the majority was silent on whether the Second Amendment only applies to "law-abiding" citizens or whether the defendant in that case was part of "the people" to whom the Second Amendment applies. The Court did not consider or mention if the defendant proposed a "course of conduct." The Court also did not attempt to analyze if the defendant's conduct was covered by the Second Amendment. The Court skipped to the last step of the analysis it established in *Bruen*.

It thus appears that the manner of application of the *Bruen* standard depends on the context of the constitutional challenge. When an undoubtedly law-abiding, ordinary individual initiates a constitutional challenge against a firearm regulation because he proposes a course of conduct he believes is lawful under the Second Amendment, courts must actually determine if the conduct purportedly being thwarted by the firearm regulation is a constitutionally protected course of conduct. Only then does a court engage in the analysis determining if the regulation is consistent with the Nation's

history of firearm regulation. However, in cases where an individual is not presumptively "law-abiding," such as when the individual's status as a convicted offender or fugitive from justice disables his right to bear arms, his "course of conduct" is presumably characterized by his unlawful actions that led to his right to bear arms being stripped. In the latter circumstance, **Rahimi** dictates that

> the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances."

**Rahimi**, 144 S. Ct. at 1898.

The instant circumstance is one where the individual challenging the constitutionality of a firearm regulation is not undoubtedly law-abiding and has proposed no future, lawful course of conduct. At the time of the M & M Lounge shooting, Appellant had a second-degree misdemeanor conviction for recklessly endangering another person.[7] A firearm was involved in that incident. While on parole for that offense, Appellant violated his parole conditions and eventually stopped reporting to his parole officer. A bench warrant was issued for his arrest. He also had an active felony warrant in an incident involving a firearm. Appellant's conduct was sufficient to deem him a "fugitive from justice" at the time of the shooting because, as discussed

---

[7] 18 Pa.C.S. § 2705.

- 17 -

*supra*, he was being sought by law enforcement for the outstanding warrants. Pursuant to *Rahimi*, we must determine if the disarmament of fugitives under section 6105 it is consistent with principles that underpin our tradition of firearm regulations.

## *Bruen* Step Two

The statute at issue here, reproduced above, states in relevant part that a person whose conduct meets the criteria of being a fugitive from justice shall not possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth. 18 Pa.C.S. § 6105(c)(1).

Appellant argues that the Commonwealth failed to meet its burden to demonstrate that the statute is consistent with this nation's historical tradition of firearm regulation. Appellant's Br. at 22-23. Section 6105 was imposed on Appellant because he was deemed a "fugitive from justice" at the time of the shooting under subsection (c)(1), not because he was convicted of a felony enumerated in subsection (b). Appellant's Br. at 29. Appellant argues that section 6105 is unconstitutional as applied to him because it infringes on conduct protected by the Second Amendment and that there is no historical analog for disarming fugitives from justice. Appellant's Br. at 24.

Currently, federal law prohibits fugitives from justice from possessing firearms, 18 U.S.C. § 922(g)(2), and about half of the states in the nation have state statutes prohibiting fugitives from possessing firearms. The Commonwealth sets forth authority demonstrating a historical tradition of

disarming those deemed to be dangerous to the public peace and those determined to be irresponsible with firearms, and asserts that "historical tradition supports disarming fugitives from justice." Appellee's Br. at 23, 26.

In determining if section 6105(c)(1) which disarms fugitives from justice is consistent with this nation's historical tradition,

> [a] court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." [*Bruen*, 597 U.S.] at 29, and n. 7, 142 S. Ct. 2111, 213 L. Ed. 2d 387. Discerning and developing the law in this way is "a commonplace task for any lawyer or judge." *Id.*, at 28, 142 S. Ct. 2111, 213 L. Ed. 2d 387.
>     Why and how the regulation burdens the right are central to this inquiry. *Id.*, at 29, 142 S. Ct. 2111, 213 L. Ed. 2d 387. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster." *Id.*, at 30, 142 S. Ct. 2111, 213 L. Ed. 2d 387. The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin." *Ibid*. (emphasis deleted).

*Rahimi*, 144 S. Ct. at 1898. This echoes what the Court had previously stated in determining when a firearm regulation is consistent with tradition: "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29.

*Rahimi* makes clear that the statute in question can pass constitutional muster if its purpose is similar to the purpose of firearm regulations at our nation's founding, even if no statute can be shown to be a historical equivalent. In *Rahimi*, the regulation at issue was a federal statute[8] that prohibits an individual from possessing a firearm if he is subject to a domestic violence restraining order which includes a finding that he "represents a credible threat to the physical safety of [an] intimate partner." *Rahimi*, 144 S. Ct. at 1984. The *Rahimi* defendant did not dispute that he was subject to a domestic violence restraining order that included such a finding but argued that on its face section 922(g)(8) violates the Second Amendment because there was no historical analog. The Supreme Court stated, "[g]iven the fact that the law at the founding was more likely to protect husbands who abused their spouses than offer some measure of accountability, it is no surprise that that generation did not have an equivalent to §922(g)(8)." *Rahimi*, 144 S. Ct. at 1905 (citation omitted). Following an extensive analysis on surety and going armed laws, the Court found that "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Id.* at 1902.

Because the purpose of preventing a perpetrator of domestic violence from owning a gun is that he presents a credible threat to the physical safety

---

[8] 18 U. S. C. § 922(g)(8).

of an intimate partner, and there is a historical tradition of disarming those who pose a threat of physical violence to another, the Court upheld the regulation. Despite the absence of a historically analogous statute and despite the defendant not having any felony convictions, the Court held that he could be disarmed consistent with the Second Amendment. *Id.* at 1903. Thus, the instant statute will be held constitutional if there is a history of regulating firearm possession for the same or similar reasons as the instant statute regulates firearm possession.

Historical Analysis

*Surety Laws*

In the 1700s and early 1800s, surety laws, derived from the ancient practice of frankpledges, had been developed to address firearm violence.

> Eventually, the communal frankpledge system evolved into the individualized surety regime. Under the surety laws, a magistrate could "oblig[e] those persons, [of] whom there is a probable ground to suspect of future misbehaviour, to stipulate with and to give full assurance . . . that such offence . . . shall not happen[,] by finding pledges or securities." 4 Blackstone 251. In other words, the law authorized magistrates to require individuals suspected of future misbehavior to post a bond. *Ibid*. If an individual failed to post a bond, he would be jailed. *See, e.g.*, Mass. Rev. Stat., ch. 134, §6 (1836). If the individual did post a bond and then broke the peace, the bond would be forfeit. 4 Blackstone 253.

*Rahimi*, 144 S. Ct. at 1899-900.

> Importantly for this case, the surety laws also targeted the misuse of firearms. In 1795, for example, Massachusetts enacted a law authorizing justices of the peace to "arrest" all who "go armed offensively [and] require of the offender to find sureties for his keeping the peace." 1795 Mass. Acts ch. 2, in Acts and Resolves

- 21 -

of Massachusetts, 1794-1795, ch. 26, pp. 66-67 (1896). Later, Massachusetts amended its surety laws to be even more specific, authorizing the imposition of bonds from individuals "[who went] armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon." Mass. Rev. Stat., ch. 134, §16; *see ibid.* (marginal note) (referencing the earlier statute). At least nine other jurisdictions did the same. *See Bruen*, 597 U. S., at 56, and n. 23, 142 S. Ct. 2111, 213 L. Ed. 2d 387.

*Id.* at 900.

*Laws Disarming Vagrants*

Vagrants, tramps, and confidence men were historically prevented from owning a firearm. "All transient persons who rove about from place to place begging, and all vagrants living without labor or visible means of support, who stroll over the country without lawful occasion, shall be held to be tramps within the meaning of this act." An Act Concerning Tramps, ch. 806, § 1, 1880 R.I. Pub. Laws 110, 110-111 (1880); *see also* An Act Concerning Tramps, ch. 176, § 2, 1880 N.Y. Laws 296, 296-297 (1880) (stating the same). "The Council shall prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise, and cause to be arrested and imprisoned, fined or set to work, all vagrants, tramps, confidence men and persons found in said city without visible means of support or some legitimate business." 1881 Kan. Sess. Laws 92, c. 37, § 24 (1881); *see* An Act to Suppress Vagabondage, ch. 188, § 4, 1879 Wis. Sess. Laws 273, 274 (1879) ("Any tramp who . . . shall carry any fire-arms or other dangerous weapon, shall . . . be punished[.]"); *see also* Order of General Sickles, Disregarding the Code, January 17, 1866 – N.Y. General Order No. 1, § 16 in *A Handbook*

*of Politics for 1868* at 36, 36-7 (1868) ("no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms."); An Act Concerning Tramps, ch. 806, § 3, 1880 R.I. Pub. Laws 110, 110-111 (1880) ("Any tramp . . . who shall be found carrying any firearm or other dangerous weapon, shall be punished").

Pennsylvania's regulation on tramps relevantly stated:

Any tramp who . . . shall be found carrying any fire-arms or other dangerous weapon, with intent unlawfully to do injury or intimidate any other person, which intent may be inferred by the jury trying the case, from the facts that the defendant is a tramp, and so armed[,] be deemed guilty of a misdemeanor, and shall be sentenced to undergo an imprisonment by separate or solitary confinement at labor for a period not exceeding three years.

Bureau of Corrections, Pt. 3—Commitments, "Tramps," § 80, *A Digest of The Law and Ordinances of the City of Philadelphia* 457, 462 (1879).

An 1884 municipal law from Illinois directed officers to arrest "vagrants" and those in violation of city ordinances, "with or without a warrant," and to bring the individual before a magistrate or justice of the peace. JOLIET, CHARTER AND REVISED ORDINANCES, ch. 49, § 2 (1884). The law directed the arresting officer "to carefully search such persons and their baggage, premises and places of abode," and seize any weapons, including pistols. *Id.* at § 3. If at trial the defendant "fail[ed] to give a good and satisfactory account of their possession of the same," the weapon would be forfeited to the city and destroyed. *Id*.

*Laws Disarming Outlaws*

Historically, "English law had disarmed not only brigands and highwaymen but also political opponents and disfavored religious groups. By the time of the founding, however, state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic." *Rahimi*, 144 S. Ct. at 1899. Brigands and highwaymen, on the other hand, were outlaws. An "outlaw" is "a lawless person or a fugitive from the law." *Outlaw*, MERRIAM-WEBSTER, (11th ed. 2024).

As the trial court notes, fugitives from justice, sometimes called "outlaws" or "wanted persons," have been historically prevented from possessing a firearm.

> Further, there is a very clear historical precedent for the instant law in effect at the time of the adoption of the United States Constitution, and only shortly after the adoption of the Pennsylvania Constitution. Consider *Respublica v. Doan*, 1 U.S. 86 (Pa. Supreme Court, 1784): the Pennsylvania Supreme Court expressly adopted the classic common law of outlawry, through which those individuals who were fugitives from justice were (depending on the circumstances) either executed (as was the sentence for the defendant, Aaron Doan, though he was later allowed to live in exile) or stripped of *all property rights*. There was no exception under the latter for firearms, which are property, and the former certainly served as a means of depriving one of the right to bear arms. An outlaw would have been considered a felon in the eyes of our founding fathers. In *Doan*, it is stated that "*Flight, in criminal cases, is itself a crime. If an innocent man flies for treason or felony, he forfeits all his goods and chattels*. Outlawry, in a capital case, is as a conviction for the crime. And many men, who never were tried, have been executed upon the outlawry." (emphasis added)[.]

Tr. Ct. Order Denying Motion to Dismiss, 9/6/23, at 4 (citing *Respublica v. Doan*, 1 U.S. 86 (Pa. Supreme Court, 1784)).

- 24 -

In 1934, the National Firearms Act became federal law. It was expanded in 1938 to include, *inter alia*, this language:

> It shall be unlawful for any person to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition to any person knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States, the several States, Territories, possessions (including the Philippine Islands), or the District of Columbia of a crime of violence or is a fugitive from justice.

National Firearms Act, ch. 850 § 2(d), 52 Stat. 1251 (1938). In addition to fugitives being prevented from receiving firearms, notably, individuals under indictment were also prevented from receiving weapons. While the Act did not outright prohibit fugitives from merely possessing firearms, three aspects of the historical context show why that was not necessary.

First, the National Firearms Act specifically states that it is "AN ACT To regulate commerce in firearms" and applies to "interstate or foreign commerce." *Id.* at 1250. Given the fact that regulating commerce was the aim of Congress in enacting this federal legislation, it is no surprise that it does not specifically criminalize the possession of firearms for certain individuals.

Second, this Act became law in 1938, not in the colonial, founding, or civil war eras. Our research reveals that by this time, most states had already enacted laws prohibiting felons, dangerous persons, confidence men, and other disorderly persons from possessing firearms. Several laws had already specifically outlawed "fugitives" from possessing weapons and authorized a

patrol to search and remove weapons from them. Unfortunately, however, these laws were racist in nature and applied primarily to enslaved African Americans. ***See, e.g.***, An Act for Establishing and Regulating of Patrols, § 6, 1736 S.C. Acts 71, 72-73 (1736); An Act Respecting Fugitives from Justice, and Persons Escaping from the Service of their Masters, 2d Cong. 2d Sess. (1793). Nonetheless, Congress may not have thought it necessary to specifically criminalize the possession by felons and fugitives because of the ubiquity of this type of regulation in state law.

Third, there was a perceived increase in crime in America in the 1930s after The St. Valentine's Day Massacre of 1929, the attempted assassination of President-elect Franklin D. Roosevelt in 1933, and thirteen years of Prohibition coming to an end in 1933. Greg S. Weaver, Firearm Deaths, Gun Availability, and Legal Regulatory Changes, 92 J. of Crim. L. and Criminology 823, 824 (2001-02). The 1934 version of the Act was "a direct response to gang violence." BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, Our History, National Firearms Act, 1934 (September 28, 2016). Caselaw surrounding the enactment of the 1938 version of the Act shows particular concern with

> roaming racketeers and predatory criminals who know no state lines-a situation beyond the power of control by local authorities to such an extent as to constitute a national menace. Many of these traveling thugs are ex-convicts, men who have been convicted of crimes of violence and presumably would not hesitate to repeat them.

- 26 -

*United States v. Platt*, 31 F. Supp. 788, 790 (S.D. Tex. 1940). This indicates that Congress passed the Act prohibiting fugitives from receiving firearms through interstate commerce with the understanding that fugitives were not to possess weapons.

Analogy to Instant Statute

Taken together, surety laws and laws disarming vagrants and outlaws offer ample support that the disarmament of Appellant, a fugitive from justice, is consistent with the Second Amendment. The purpose of section 6105 preventing a fugitive from possessing a firearm, whether at home or in public, is that law enforcement anticipates adverse confrontation with that individual. A fugitive from justice knows he is being sought by law enforcement and can reasonably expect that he will be met with arrest, but has shown an interest in avoiding capture and prosecution, evidenced by his action of fleeing or evading the law in the first place. An individual obtains the status of "fugitive from justice" if he evades law enforcement such that a bench warrant is issued, *Smith, supra*. In this case, the bench warrant was issued because Appellant violated conditions of his parole.

The practical implication of Appellant's violation of parole is analogous to that of a violation of the surety laws. Historically, upon probable grounds to suspect an individual of future misbehavior, he would be compelled by a magistrate to give assurance that he would not commit an offense and remain on "good behavior." *See e.g.*, An Act for punishing Criminal Offenders, 1795

Mass. Laws 436, ch. 2. Certain people called "sureties" were approved by the county to ensure the individual kept the peace as promised. *See, e.g.*, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a) (1914). If the individual committed an offense within a specified duration of time, usually six months or one year, the surety would be responsible for presenting the individual to the court to answer for his offense. People who violated surety laws could be disarmed and jailed.

Here, Appellant, having committed a crime and served a period of incarceration, was placed on parole. As a parolee, Appellant was required to agree to certain terms and conditions, including not committing any new crimes or using illegal substances. This was essentially an assurance of good behavior from Appellant. Appellant was under supervision of an officer from the Department of Probation and Parole, an individual approved by the county to ensure Appellant followed the conditions. Upon violating the conditions of his parole, including his consumption of illegal drugs, a petition for parole violation was submitted to the court and a bench warrant was issued for Appellant to answer for his violations. The warrant issued by the court ordered a police officer to "convey and deliver" Appellant into the custody of the court. "If the Court is unavailable, the individual may be held in the County Jail." Bench Warrant, 4/25/19. Appellant's elusion from law enforcement despite his warrant deemed him a fugitive from justice and warranted his disarmament and arrest.

The purpose of disarming vagrant individuals was that they were seen as "idle and disorderly," having no ties to a particular community. Lawmakers feared these individuals, moving around for no lawful reason and without holding employment or working a legitimate job, would become beggars or thieves. *See, e.g.*, N.Y. LAWS, ch. 1233, §§ 1-3 (Hugh Gaine 1774) (Law Passed 1763). Thus, they were treated as a threat to public safety.

Here, Appellant's movement throughout the Commonwealth while having a fugitive status was unlawful for a multitude of reasons. One of the conditions of Appellant's parole was to reside at his approved address, but he violated the condition by moving without permission. His whereabouts were unknown at the time the warrant was issued. Appellant also failed to maintain employment, another condition of his parole. Thereafter, Appellant was charged with Fleeing or Attempting to Elude Police Officer after he fled from a traffic stop. Appellant had an outstanding felony warrant that was issued several weeks before the shooting. Finally, Appellant attempted a homicide outside M & M Lounge. There is historical evidence in regulations from the colonial, founding, and civil war eras that lawmakers disarmed such individuals.

Finally, we examine if the burden section 6105(c)(1) imposes on the right to bear arms fits within our regulatory tradition. *Rahimi*, 144 S. Ct. at 1901-02. We note that section 6105(c)(1) only applies when someone flees or escapes from law enforcement once apprehension has commenced, or

eludes law enforcement or prosecution such that a warrant is issued, like when an individual does not appear in court when he knows he is required by court order. Moreover, any person deemed a fugitive from justice under section 6105(c)(1) "may make application to the court of common pleas . . . for relief from the disability imposed by this section upon the possession, transfer or control of a firearm." 18 Pa.C.S. § 6105(d). Upon such application, the court must hold a hearing. 18 Pa.C.S. § 6105(e)(1). This corresponds with surety laws which involved judicial determinations of whether a particular defendant was likely to commit an offense before requiring him to post a bond.

Moreover, like the surety bonds, and like the statue in **Rahimi**, the firearm restriction authorized by section 6105(c)(1) is temporary. In **Rahimi**, it was for as long as the defendant was subject to a domestic violence order. Here, it would have been for as long as Appellant was a fugitive from justice. Appellant could have initiated proceedings by submitting an application under section 6105(d) to have his fugitive status removed if he met certain requirements. Or, upon service of Appellant's outstanding warrants and his arrest pursuant to them, or upon Appellant reporting to the parole department, or upon turning himself in for the felony arrest warrant, Appellant would no longer be a fugitive from justice. At that moment, his ability to possess a firearm in the future would be determined by the outcome of the proceedings for which he was being sought by law enforcement.

We have no trouble concluding that section 6105(c)(1) survives Appellant's constitutional challenge and that he may be disarmed as a fugitive of justice consistent with the Second Amendment.

Pennsylvania Constitution

We now turn to Appellant's claim that section 6105 violates Article 1, Section 21 of the Pennsylvania Constitution. The relevant portion of the Pennsylvania Constitution states, "The right of the citizens to bear arms in defense of themselves and the State shall not be questioned." PA. CONST. ART. 1, § 21. As stated earlier, the Second Amendment states, "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II.

Appellant urges this Court to engage in analysis pursuant to **Commonwealth v. Edmunds**, 586 A.2d 887, 895 (Pa. 1991), Appellant's Br. at 54, and determine that the Pennsylvania Constitution provides greater protection to the right to bear arms than the Second Amendment does. Appellant's Br. at 43-44.

The Commonwealth argues that Pennsylvania's Constitution does not provide greater protection to the right to bear arms than the federal Constitution does, and that section 6105 is constitutional under the Pennsylvania Constitution. Appellee's Br. at 31.

In **Edmunds**, we stated as a general rule that when a defendant asserts greater protection under the Pennsylvania Constitution than its federal counterpart, the litigants must brief and analyze four factors:

1) text of the Pennsylvania constitutional provision;
2) history of the provision, including Pennsylvania case-law;
3) related case-law from other states;
4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence.

**Edmunds**, 586 A.2d at 895.

A panel of this Court recently analyzed a challenge to the constitutionality of sections 6105 and 6106 by a convicted felon. **Commonwealth v. Nieves-Crespo**, No. 980 MDA 2023, 2024 Pa. Super. Unpub. LEXIS 1235 (May 17, 2024).[9] There we declined to analyze the **Edmunds** factors or determine that the Pennsylvania Constitution provides greater protection than the Second Amendment. **Id.** at *35. We gave three reasons:

First, firearms regulations, like Sections 6105 and 6106, retain constitutional validity under **Bruen** and Appellant offers no evidence or authority to undermine that conclusion. Second, a previous panel of this Court expressly found that Section 6106 did not violate Article I, Section 21. **See Commonwealth v. McKown**, 2013 PA Super 282, 79 A.3d 678, 691 (Pa. Super. 2013). Third, a review of case law promulgated throughout the Commonwealth reveals that, when confronted with a claim that a statute is violative of both the Second Amendment of the United States Constitution and Article I, Section 21

---

[9] We note that, pursuant to Pa.R.A.P. 126(b), unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value. We find guidance in the unpublished memorandum cited supra and find it to be persuasive in this matter.

of Pennsylvania's Constitution, Pennsylvania courts engage in a singular analysis, suggesting that both provisions offer the same protection. *See id.* at 691 (analyzing the appellant's challenge to 18 Pa.C.S.A. § 6106 under Article I, Section 21 pursuant to the same framework as that of the Second Amendment); *see also Caba v. Weaknecht*, 64 A.3d 39, 53 (Pa. Commw. 2013); *Perry v. State Civ. Serv. Comm'n (Dep't of Lab. & Indus.)*, 38 A.3d 942, 954-955 (Pa. Commw. 2011). We therefore decline to hold that Article I, Section 21 of the Pennsylvania Constitution offers heightened protection to one's right to bear arms.

*Id*.

Both parties extensively briefed these factors, and we will briefly highlight their arguments. Appellant points to the difference in language between "the People" and "the citizens," and between "shall not be infringed" and "shall not be questioned" in the Second Amendment and Article 1, Section 21, respectively. Appellant's Br. at 45, 46; Reply Br. at 10. Appellant acknowledges that no Pennsylvania case has held that Article 1, Section 21 provides greater protection than the Second Amendment, but asserts that no cases have held to the contrary. Appellant's Br. at 59. The Commonwealth cites cases from Pennsylvania courts that have emphasized that the right to bear arms is not unlimited and may be regulated and restricted. Appellee's Br. at 33. The Commonwealth reiterates the well-settled principal that "duly enacted legislation carries with it a strong presumption of constitutionality." *Id.* at 26 (citing *Commonwealth v. Turner*, 80 A.3d 754, 759 (Pa. 2013)).

First, to the extent that the difference in language between the Federal and Pennsylvania Constitutions ever indicated stronger protections under Article 1, Section 21, the United States Supreme Court homologized the

protections in ***District of Columbia v. Heller***, 554 U.S. 570 (2008). The Second Amendment confers a "right of the people to keep and bear Arms," mentioning the militia and the state, but not mentioning the defense of self. U.S. CONST. AMEND. II. The Pennsylvania Constitution, on the other hand, confers a "right to bear arms in *defense of themselves and the state*." PA. CONST., ART. 1, § 21 (emphasis added). This language makes it explicit that the right in Pennsylvania is not limited to militia service, where the Second Amendment's language is less clear. In ***Heller***, the Court interpreted the Second Amendment as conferring an "individual right" to possess a firearm unconnected with service in a militia and to use that firearm for traditionally lawful purposes, such as self-defense within the home. ***Heller***, 554 U.S. at 583-83. Thus, to the extent Article 1, Section 21 could have been read to offer broader individual rights than the Second Amendment does, the Supreme Court confirmed that the Second Amendment reaches to the same extent. Since 2008, both the Pennsylvania and Federal Constitutions have been understood to provide an individual right to firearm possession untethered to militia service.

Second, we agree with the ***Nieves-Crespo*** Court that when confronted with a claim that a statute is violative of both the Second Amendment and Article I, Section 21, Pennsylvania courts have routinely engaged in a singular analysis, suggesting that both provisions offer the same protection. Since the United States Supreme Court decided ***Bruen*** in 2022,

Pennsylvania courts have undertaken only that analysis. When the Supreme Court issued its June 2024 opinion in *Rahimi*, it emphasized that the key consideration is whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. The lengthy historical analysis above reveals that disarming people similarly situated to Appellant is not only part of this nation's history of firearm regulation, but also of Pennsylvania's history. *See* Bureau of Corrections, *supra*; *Republic v. Doan, supra*.

Finding no evidence that Article I, Section 21 of the Pennsylvania Constitution offers heightened protection to one's right to bear arms or requires a separate analysis, we conclude that Appellant's constitutional challenges fail. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/09/2024